# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| ANTHIA R. HILL, *et al.*, | ) | Honorable Jacqueline P. Cox |
| | ) | |
| Debtors. | ) | Case Nos. 16-17113 |
| | ) | (Jointly Administered) |
| | ) | |
| FRANCES GECKER, not individually, but | ) | |
| solely in her capacity as chapter 7 trustee of | ) | |
| the bankruptcy estates of Anthia R. Hill and | ) | |
| Network Salon Services, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | Adv. No. 17-00429 |
| | ) | |
| v. | ) | |
| | ) | |
| COMPLETE BUSINESS SOLUTIONS | ) | |
| GROUP, INC., a Delaware Corporation and | ) | |
| FAST ADVANCE FUNDING, LLC., a | ) | |
| Pennsylvania limited liability company, | ) | |
| JOSEPH MCELHONE, an individual, and | ) | |
| GINO GIOE, an individual, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED ADVERSARY COMPLAINT

Frances Gecker, not individually but solely as the chapter 7 trustee (the "**Trustee**") of the

bankruptcy estates of Network Salon Services, LLC ("**Network Salon**") and Anthia R. Hill, by

and through her attorneys, brings this Amended Adversary Complaint (the "**Complaint**") against

defendants Complete Business Solutions Group, Inc. ("**CBSG**"), Fast Advance Funding, Inc.

("**Fast Advance**"), Joseph McElhone, and Gino Gioe. In Count I of the Complaint, the Trustee

seeks an order of civil contempt under 11 U.S.C. § 105(a) against CBSG, Mr. McElhone, and Mr.

Gioe for willful actions taken in violation of the automatic stay imposed by 11 U.S.C. § 362(a). In

Count II, the Trustee seeks under 11 U.S.C. §§ 547(b) and 550(a) to avoid and recover preferential

transfers taken from Network Salon by CBSG. In Count III, the Trustee seeks under 11 U.S.C. §

548(a)(1)(A) and 11 U.S.C. § 550(a) to avoid and recover as actual fraudulent transfers obligations

incurred by Network Salon to CBSG and transfers taken from Network Salon by CBSG from

September 22, 2015 through May 20, 2016, the date on which Ms. Hill and Network Salon filed

their bankruptcy petitions (the "**Petition Date**"). In Count IV, the Trustee seeks under 11 U.S.C. §

548(a)(1)(B) and 11 U.S.C. § 550(a) to avoid and recover as constructively fraudulent transfers

obligations incurred by Network Salon to CBSG and transfers taken from Network Salon by

CBSG during the two years prior to the Petition Date. In Count V, the Trustee seeks under 11

U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 550(a) to avoid and recover as constructively fraudulent

transfers obligations incurred by Network Salon to Fast Advance and transfers taken from

Network Salon by Fast Advance during the two years prior to the Petition Date. In Count VI, the

Trustee seeks to recover overpayments taken from Network Salon by Fast Advance. In Count VII,

the Trustee seeks punitive damages and restitution of amounts knowingly and tortiously taken

from Network Salon by CBSG despite the failure of the condition precedent to any right to

payment CBSG may have had. In Count VIII, the Trustee seeks punitive damages and restitution

of amounts knowingly and tortiously taken from Network Salon by Fast Advance despite the

failure of the condition precedent to any right to payment Fast Advance may have had. In Count

IX, the Trustee seeks restitution of amounts taken from Network Salon by CBSG to which CBSG

was not contractually entitled. In Count X, the Trustee seeks restitution of amounts taken from

Network Salon by Fast Advance to which Fast Advance was not contractually entitled. In Count

XI, the Trustee seeks disallowance of any and all claims that have been or may be filed by CBSG

or Fast Advance. To that end, the Trustee complains as follows:

## I.  JURISDICTION AND VENUE

1.  The Court has jurisdiction over this matter pursuant to section 1334 of title 28 of the United States Code. This is a core proceeding pursuant to section 157(b)(2)(A), (B), (F), (H) and (O) of Title 28 of the United States Code and the Trustee consents to the entry of a final order.

2.  Venue is proper in this district pursuant to sections 1408 and 1409 of title 28 of the United States Code. This Court has personal jurisdiction over CBSG, Fast Advance, Mr. McElhone and Mr. Gioe pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy Procedure.

## II.  PARTIES AND BACKGROUND

3.  On the Petition Date, Network Salon and Anthia R. Hill filed petitions (the "**Bankruptcy Cases**") under chapter 7 of Title 11 of the United States Code (the "**Bankruptcy Code**").

4.  Plaintiff Frances Gecker is the chapter 7 trustee of the bankruptcy estates of Network Salon and Anthia R. Hill and is duly qualified and appointed under 11 U.S.C. § 701(a)(1) by the Office of the United States Trustee.

5.  Network Salon is a limited liability company organized under Illinois law.

6.  Anthia R. Hill is a citizen of the State of Illinois.

7.  CBSG is a Delaware corporation with its principal place of business located at 141 North Second Street, Philadelphia, Pennsylvania, 19106.

8.  Fast Advance is a Pennsylvania limited liability company with its principal place of business located at 141 North Second Street, Philadelphia, Pennsylvania, 19106.

9.  On information and belief, Joseph McElhone is a citizen of the Commonwealth of Pennsylvania.

10.  On information and belief, Gino Gioe is a citizen of the State of New York.

## A. Network Salon's Business

11.    Network Salon was in the beauty supply business. It was a distributor of professional salon products, such as shampoo, hairspray, and conditioner, to independent salons and hairdressers.

12.    Brian and Anthia Hill, a married couple, founded Network Salon in 2004 when Mr. Hill, who had made a career in the beauty supply business, lost his job shortly after being transferred from Los Angeles to Chicago. Mr. Hill's job had been the family's sole source of income.

13.    Ms. Hill agreed to help Mr. Hill with the new business by packing and shipping customer orders.

14.    Mr. Hill handled all of Network Salon's finances and other operations.

15.    Mr. Hill handled all the family's personal finances.

16.    Network Salon sold most of its products on a very narrow margin and sometimes agreed to sell and ship products at a net loss to promote a manufacturer's product line or to develop relationships with new customers.

17.    While Network Salon generated substantial revenue, it earned minimal net income.

## B. Mr. Hill's Death

18.    Until sometime in late 2010, Mr. Hill supported his family of four and the Network Salon business by working as a consultant for another beauty supply distributor.

19.    Near the end of 2010, Network Salon began to generate sufficient income to allow Mr. Hill to leave his consulting job and run Network Salon full time.

20.    Shortly afterwards, in early 2011, Mr. Hill began to feel ill.

21.     In March 2011, Mr. Hill received a diagnosis of Stage IV pancreatic cancer.

Despite multiple surgeries, chemotherapy, and other treatment, Mr. Hill died three months later, in

June 2011, at the age of 43.

22.     Because Mr. Hill did not have health insurance, Ms. Hill was required to pay all the

expenses of his catastrophic illness in an amount exceeding $400,000.

## C.  The Slide into Bankruptcy

23.     While Mr. Hill was alive, Network never borrowed money or sold its assets, other

than in the ordinary course of its business of selling beauty supplies.

24.     While Mr. Hill was alive, he kept the business going by using cash from his outside

earnings.

25.     After Mr. Hill's death, Network Salon became the sole means of support for Ms.

Hill and her two children. Ms. Hill, who never drew a salary, paid all the family's basic living

expenses through Network Salon.

26.     When Mr. Hill died, Ms. Hill became Network Salon's manager and sole member,

responsible for all its operations and business affairs, including its financial operations.

27.     Ms. Hill has no formal education and never learned basic arithmetic. She cannot

perform a multiplication operation; does not know how to calculate a percentage; and, even today,

does not fully comprehend what a percentage means.

28.     Ms. Hill had never handled finances prior to her husband's death.

29.     Ms. Hill never had a bank account until, in the month before his death, Mr. Hill

took her to the bank and opened one for her.

30.     During the last three months of Mr. Hill's life, he was too ill and too weak to

manage financial affairs for his family or for Network Salon. He was also too ill to engage in sales

activities for Network Salon.

31.    During Mr. Hill's illness the business began to experience liquidity issues.

32.    After Mr. Hill's death and Ms. Hill's payment of his final expenses, Network Salon's liquidity issues became worse.

33.    Sometime in 2013, Network Salon lost its most profitable product, Lilash, an eyelash enhancer, after Lilash's manufacturer lost an unfair competition lawsuit to Allergan, Inc., the manufacturer of the prescription eyelash enhancer Latisse. Until then, Ms. Hill relied on the profits from Lilash sales to keep Network Salon going.

34.    Ms. Hill tried but was unable to obtain traditional financing because she had no credit history. During Mr. Hill's life, he carried out all financial transactions, both personal and business, in his name only.

35.    By January 2013, Network Salon lacked the cash flow to make regular payroll.

36.    In January 2013, Network Salon lacked the funds to pay its vendors and for a while, the bank covered its checks, creating overdrafts for which Network Salon incurred overdraft fees.

37.    Around that time, Ms. Hill received a "fake check" in the mail offering Network Salon what Ms. Hill understood to be business loans requiring minimal paperwork and with the loan proceeds available in days.

38.    From or about January 2013 through the Petition Date, Network Salon, in its own name and through Bathhouse Luxury Imports, LLC, ("**Bathhouse**")[1], a related entity owned and managed by Ms. Hill, borrowed and Ms. Hill personally guaranteed millions of dollars from more than a dozen non-traditional lenders, who refer to themselves as Merchant Cash Advance

---

[1] The Bathhouse transactions are fully detailed in the Trustee's Amended Complaint in related adversary proceeding No. 17-00066, *Gecker v. Cap Call, LLC*. In the Amended Complaint, the Trustee alleges that, among other things, MCA provider Cap Call, LLC ("**Cap Call**") induced Ms. Hill and Network Salon to conceal their MCA transactions with Cap Call from Network Salon's other lenders and/or MCA providers by running the Cap Call transactions through Bathhouse, a shell entity.

("**MCA**") providers ("**MCA Provider(s)**"), at high interest rates, often using the proceeds from one loan ("**MCA Proceeds**") to keep payments current on other loans or to repay older loans.

39.     Bloomberg Businessweek has defined MCAs as "a legal way to lend money to small businesses at interest rates higher than Mafia loan sharks once charged. Completely unregulated, last year [they] surpassed the U.S. Small Business Administration as a source of loans for less than $150,000, according to the industry newsletter DeBanked, one of the few places with reliable information." BLOOMBERG BUSINESSWEEK, https://www.bloomberg.com/news/features/2015-10-06/how-two-guys-lost-god-and-found-40-million (last visited June 12, 2018). A copy of the article, which traces the history and development of MCA companies, is attached as **Exhibit A.**

40.     In mid-January 2013, Network Salon entered into its first MCA Agreement, which Ms. Hill believed to be a loan. On January 15, 2013, MCA Provider Merchant's Capital Advance ("**Merchant's**") deposited $100,705 into Network Salon's operating account.

41.     On January 18, 2013, Merchant's began debiting the operating account $1,090 every business day. Ms. Hill soon realized that Network Salon, which had a net operating loss of $193,345 in tax year 2013, would not be able to continue the daily payments and sought additional MCAs to cover them.

42.     Over the six months prior to the Petition Date, Network Salon had as many as thirteen concurrent MCAs payable to at least six different MCA providers and was paying approximately $32,000 each business day.

**D.  The Bank Accounts**

43.     Most of Network Salon's MCA agreements, including the MCA agreements with Fast Advance and CBSG, required Network Salon to grant online access to at least one of its bank accounts by providing login information to the counterparty MCA Provider. The login information allowed the given MCA Provider to make regular ACH debits from one or more of Network

Salon's bank accounts as repayments for sums advanced to Network Salon. The login information also allowed the given MCA Provider to view all transactions, including other MCA transactions, in the Network Salon accounts to which the given MCA Provider had access.

44.     Prior to June 2015, most of Network Salon's MCA transactions were processed through its account at Fifth Third Bank ("**5/3**") ending in the numbers 7272 (the "**Operating Account**").

45.     As Network Salon cycled deeper and more hopelessly into MCA debt, each MCA Provider could see what other MCA Providers were debiting from the Operating Account. By June 2015, MCA Provider Yellowstone Capital, LLC ("**Yellowstone**")[2], with which Network Salon had already entered into three MCA transactions, required that its transactions be processed through Network Salon's 5/3 account ending in the numbers 3265 (the "**Yellowstone Account**"), rather than the Operating Account.

46.     Over the six months prior to the Petition Date, Network Salon had at least twelve different checking accounts at 5/3 and one checking account at BMO Harris ("**BMO**"). Bathhouse had one checking account at 5/3, ending in the numbers 6289 (the "**Bathhouse Account**"). Ms. Hill had a personal account at 5/3, ending in the numbers 0195 (the "**Personal Account**").

**E.    The LQD Loans**

47.     On September 22, 2015, Network Salon, in its own name and through Bathhouse, owed at least $750,000.00 to at least four MCA Providers, including Fast Advance, CBSG, Cap Call, and Yellowstone.

---

[2] Yellowstone is the defendant in related adversary proceeding No. 17-00076.

48.     On September 22, 2015, Network Salon and Ms. Hill borrowed $470,000.00 (the

"**First LQD Loan**"), from LQD Business Finance LLC ("**LQD**") which was memorialized by the

LQD Business Finance LLC Loan Agreement (the "**First LQD Loan Agreement**"). A copy of the

First LQD Loan Agreement is attached hereto as **Exhibit B**.

49.     In the First LQD Loan Agreement, Network Salon and Ms. Hill gave

representations, covenants, and warranties that Network Salon would not "sell, dispose, convey or

otherwise transfer any of its future receivables" or incur any debt on the business without LQD's

prior written consent. First LQD Loan Agreement, § 13(c).

50.     Network Salon and Ms. Hill also agreed not to grant any security interests or liens

on Network Salon's accounts receivable and other assets and prospectively to disclose the

existence of any such liens or security interests. *Id.* at § 13(d).

51.     Section 11 of the First LQD Loan Agreement provides that breaches of

representations, covenants and warranties are Events of Default.

52.     The proceeds of the First LQD Loan were earmarked to pay $449,085.54 of

Network Salon's debt to CBSG d/b/a Par Funding and Fast Advance, as identified in the First

LQD Loan Agreement at Schedule A ("**Schedule A**").

53.     LQD was not aware of the MCA agreements with Cap Call and Yellowstone

because in or about June 2015, Yellowstone started processing its transactions through the

Yellowstone Account and Cap Call always processed its transactions through the Bathhouse

Account.

54.     LQD disbursed the LQD Loan proceeds to CBSG and Fast Advance in the amounts

set forth on Schedule A of the First LQD Loan Agreement.

55.     The First LQD Loan was secured by substantially all of Network Salon's assets,

including after-acquired property.

56.     On September 18, 2015, LQD filed a UCC-1 financing statement with the Illinois Secretary of State, perfecting its security interest.

57.     Notwithstanding the First LQD Loan, Network Salon's liquidity issues persisted, and on November 25, 2015, Network Salon and LQD executed the Amended and Restated Loan Agreement, whereby LQD increased Network Salon's principal loan balance from $470,000.00 to $600,000.00 (the "**Second LQD Loan Agreement**," and with the First LQD Loan, the "**Senior LQD Loans**") A copy of the Second LQD Loan Agreement is attached hereto as **Exhibit C**.

58.     The Senior LQD Loans are perfected and secured by a first position security interest in substantially all of Network Salon's assets, including its future receivables.

59.     Because LQD has a valid first-priority security interest in all of Network Salon's assets and Network Salon has insufficient funds to repay LQD, all other secured creditors are undersecured creditors whose debt is treated as unsecured.

**F.  Fast Advance**

60.     Fast Advance is an MCA Provider.

61.     On information and belief, Fast Advance is related to and associated with CBSG.

62.     Fast Advance does business from CBSG's address.

63.     Fast Advance and CBSG have owners and/or management in common.

64.     CBSG has filed lawsuits in which it names itself as "Complete Business Solutions Group, Inc. a/k/a Fast Advance Funding." *See* Complaint, *Complete Business Solutions Group, Inc. a/k/a Fast Advance Funding v. Protection Legal Group, LLC*, Case No. 16-cv-04267 in the United States District Court for the Eastern District of Pennsylvania, attached as **Exhibit D**.

65.     Lisa McElhone is the Manager of Fast Advance. *See* Declaration of Lisa McElhone, filed on March 16, 2018 in *Fabricant v. Fast Advance Funding, LLC*, Case No. 17-cv-

05753, pending in the United States District Court for the Central District of California, attached as **Exhibit E**.

66.     On information and belief, Lisa McElhone is married to defendant Joseph McElhone.

67.     In its Rule 26(a) Disclosures (the "**Rule 26 Disclosures**"), submitted to the Trustee on January 29, 2018, CBSG identified Joseph McElhone as a "senior executive at CBSG." *See* CBSG's Rule 26(a)(1) Initial Disclosures, attached as **Exhibit F**. Mr. McElhone was the only CBSG officer, manager, or employee identified by CBSG in its Rule 26 Disclosures.

68.     On information and belief, Jamie McElhone is related to both Lisa and Joseph McElhone.

69.     On information and belief, Jamie McElhone was a founder of Fast Advance and owns or owned a membership interest in Fast Advance.

70.     On March 6, 2015 Citizens' Bank sent email confirmations for wire transfers to Network Salon ordered by Fast Advance to jamie@parfunding.com. Copies of the email confirmations are attached as **Group Exhibit G**.[3]

71.     Fast Advance is in the business of providing operating capital to small businesses unable to obtain financing from traditional, regulated lenders, like banks and credit unions. As set forth on Fast Advance's website:

> What is a merchant cash advance (MCA)? We look at your business' income to determine if you can pay back the funds. We give you a portion of future credit card sales to acquire capital within 48 hours. Each day, a percentage of the daily credit card results are withheld to pay back the MCA. This percentage is based on the amount of funds a business receives, how long it will take to pay back the money, and how big the monthly credit card sales are. This continues until the advance is paid in full.

---

[3] CBSG produced these emails to the Trustee, although CBSG did not identify Jamie McElhone in its Rule 26(a) Disclosures.

FAST ADVANCE FUNDING, https://fastadvancefunding.com/ (last visited May 18, 2018).

72.    Fast Advance further advertises that it is the founder of MCA consolidation

programs and that:

> You can gain control of your cash by restructuring your current advances. This will also
> help you get your credit up as well as make you bankable. Don't you finally want to get rid
> of your merchant cash advances? You can do this and build your business at the same time.

*Id.*

## G.  CBSG and CBSG d/b/a Par Funding

73.    CBSG is an MCA Provider.

74.    CBSG does business both in its own name and as Par Funding.

75.    Dun and Bradstreet ("**D&B**") lists Lisa McElhone as CBSG's Chief Executive

Officer. A copy of the D&B report is attached as **Exhibit H**.

76.    D&B lists an individual using the name "Joe Macki" as CBSG's Sales Manager.

*See* Ex. H, D&B Report.

77.    Ms. Hill has identified Joe Macki as defendant Joseph McElhone.

78.    In its Responses (the "**Discovery Responses**"), attached as **Exhibit I**, to the

Trustee's First Set of Interrogatories, Requests for Production of Documents and Requests for

Admission, dated February 15, 2018 (the "**Discovery Requests**"), CBSG denied that Mr.

McElhone uses the name "Joe Mack or Joe Macki from time to time." *See* Discovery Responses,

Request to Admit No. 21. CBSG did not identify "Joe Macki" or "Joe Mack" in its Rule 26

Disclosures or in its Discovery Responses.

79.    CBSG is in the business of providing operating capital to small businesses unable

to obtain financing from traditional, regulated lenders, like banks and credit unions. As set forth

on Par Funding's website:

Too many business owners never even consider a cash advance because they're maxed out on their personal credit, their credit score is in the tank just keeping this business afloat, and worry about one more rejection. At Par Funding, we have worked tirelessly to find innovative ways to help our clients have the best chances at getting the financial resources they need. It's about your future potential … not what's happened in the past or your personal credit history.

PAR FUNDING, https://www.parfunding.com/about-us/ (last visited May 16, 2018).

80.    Par Funding presents "Customer Experiences" on its homepage, publicly quoting its customers' references to the loans they received:

- "[T]hey funded my *loan* as quickly as I have ever experienced." Don Williams, Chairman and CEO, WebTec Holding Corporation;
- "After my initial *loan*, Par funded me in a time of emergency based on the relationship we had established." Velda Wilson, Owner, Wilson's Day CarE.

*Id.* at https://www.parfunding.com/ (last visited May 16, 2018) (emphasis added).

81.    Although it publicly advertises the "loans" it has made, CBSG refers to the funds it provides as MCAs and states that they are not loans.

82.    Although CBSG publicly advertises the "loans" it has made, CBSG states that it is an MCA Provider and that MCAs are not loans.

83.    CBSG advertises that it will fund businesses with bad credit. *Id.* (last visited May16, 2018).

**H.  The Fast Advance Agreements**

84.    Since on or before March 5, 2015, Fast Advance has provided MCAs to Network Salon (the "**Fast Advance Transactions**").

85.    Between March 5, 2015 and August 14, 2015, Fast Advance entered into at least three MCA agreements with Network Salon (the "**Fast Advance Agreements**" and each a "**Fast Advance Agreement**"). Copies of the Fast Advance Agreements are attached as **Group Exhibit J**.

86.     The Fast Advance Agreements are form agreements and the form language and terms are the same in each Fast Advance Agreement.

87.     In connection with the Fast Advance Agreement dated March 5, 2015 (the "**First Fast Advance Agreement**"), Fast Advance required online access to Network Salon's bank accounts, including the Operating Account and the Yellowstone Account, as well as to the Personal Account. *See* First Fast Advance Agreement.

88.     At all times relevant to this adversary complaint, Fast Advance was aware that Ms. Hill and Network Salon were repeat customers of various MCA Providers.

89.     Prior to entering into the First Fast Advance Agreement, Fast Advance was aware that Network Salon already owed money to other MCA Providers and was making payments to MCA Providers Knight Capital Funding ("**Knight**"), World Global Finance, LLC ("**World Global**"), Capital Stack, Yellowstone, and New Era Lending ("**New Era**") in the total daily amount of $3,298.47.

90.     Fast Advance was further aware that in February 2015, Network Salon had incurred multiple overdrafts as a result of its MCA payment obligations. A copy of the February 2015 statement from the Operating Account is attached as **Exhibit K.**

91.     In the First Fast Advance Agreement, Fast Advance purported to purchase $140,000 of Network Salon's "Receipts," as defined in each Fast Advance Agreement, for $100,000.

92.     Each Fast Advance Agreement included an addendum (the "**FAF Addendum**") in which Ms. Hill agreed that:

> [S]he will not enter into any Merchant Cash Advances, arrangement, agreement or commitment that relates to or involves the Receipts, whether in the form of a purchase of, loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales with any party other than Fast Advance Funding.

93.     The First Fast Advance Agreement further provided that Fast Advance would pay off Network Salon's balances with Knight, Capital Stack, and Yellowstone and deposit approximately $27,730 to the Operating Account.

94.     On information and belief, on March 6, 2015, Fast Advance deposited $25,854.82 to the Operating Account. A copy of the March 2015 Operating Account Statement (the "**March 2015 Statement**") is attached as **Exhibit L**.

95.     On March 10, 2015, Fast Advance began debiting the Operating Account $1,590 every business day. *See* Ex. L, March 2015 Statement.

96.     Although Fast Advance was aware that the Network's Salon's MCA agreements with World Global and New Era remained in effect and World Global and New Era continued to make daily debits to the Operating Account, *see* Ex. L, March 2015 Statement, section 2.11 of each Fast Advance Agreement, including the First Fast Advance Agreement, provides a representation and warranty that Network Salon had "good, complete and marketable title to all Receipts, free and clear of any liabilities, liens, claims . . . rights, security interests, pledges and encumbrances of any kind or nature whatsoever."

97.     Section 3.1 of each Fast Advance Agreement provides that violation of any term or representation of the agreement or that any "incorrect, false or misleading" representation or warranty made by Network Salon are events of default.

98.     Despite the provisions of sections 2.11 and 3.1, from March 5, 2015 through August 14, 2015, Network Salon and Bathhouse entered into multiple MCA agreements with other MCA providers, including CBSG.

99.     From its access to Network Salon's bank accounts, Fast Advance knew or should have known that Network Salon was engaged in multiple MCA transactions with multiple MCA

Providers other than Fast Advance. *See* Exs. K and L, February-March 2015 Operating Account Statements.

100.    From its access to the Operating Account, Fast Advance was able to see that starting on April 17, 2015, Network Salon began regularly writing large checks to and receiving large checks from Bathhouse. A copy of the April 2015 Operating Account Statement is attached as **Exhibit M**.

101.    On May 4, 2015, Network Salon and Fast Advance entered into a second MCA agreement in which Fast Advance purported to pay off existing Network Salon debt in the amount of $76,475 and to advance $50,000 to Network Salon in exchange for Network Salon's promise to pay $177,039 (the "**Second Fast Advance Agreement**").

102.    On information and belief, on May 4, 2015, Fast Advance deposited $48,832.00 into the Operating Account. A copy of the May 2015 Operating Account Statement is attached as **Exhibit N**.

103.    On May 5, 2015, Fast Advance began making two daily debits to the Operating Account of $ 1,106.49 each, for a total of $2,212.98 each business day. *See* Ex. N, May 2015 Operating Account Statement.

104.    From its access to Network Salon's bank accounts, Fast Advance was able to see that on June 5, 2015, Yellowstone began new daily debits of $1,199 from the Yellowstone Account. A copy of the June 2015 Yellowstone Account Statement is attached as **Exhibit O**.

105.    On August 14, 2015, Network Salon and Fast Advance entered into a third MCA agreement, (the "**Third Fast Advance Agreement**"), in which Fast Advance purported to pay off existing debt of $63,573.27 and to advance $30,000 to Network Salon in exchange for Network Salon's promise to pay $131,002.58.

106.    On information and belief, on August 14, 2015, Fast Advance deposited $27,550.51 to the Operating Account. A copy of the August 2015 Operating Account Statement is attached as **Exhibit P**.

107.    On August 17, 2015, Fast Advance began debiting $1,488.67 from the Operating Account every business day. *See* Ex. P, August 2015 Operating Account Statement.

108.    On or about September 22, 2015, and in connection with the First LQD Loan, LQD paid $107,183.86 to Fast Advance, completely retiring Network Salon's debts to Fast Advance. *See* Ex. B, First LQD Loan Agreement, Schedule A.

I.    **The CBSG Agreements**

109.    Since on or before March 26, 2015, and during the pendency of the Fast Advance Agreements, CBSG has provided MCAs to Network Salon (the "**CBSG Transactions**").

110.    Despite sections 2.11 and 3.1 of the Fast Advance Agreements and the FAF Addendum, CBSG entered into MCA agreements with Network Salon while the Fast Advance Agreements were in effect.

111.    At all times relevant, Fast Advance and CBSG were each aware that the other was engaged in MCA transactions with Network Salon.

112.    Between March 25, 2015 and March 21, 2016, CBSG entered into at least fifteen MCA agreements with Network Salon (the "**CBSG Agreements**" and with the Fast Advance Agreements, the "**Agreements**"), attached hereto as **Group Exhibit Q**.

113.    Each of the CBSG Agreements was a form contract substantially similar to the Fast Advance Agreements and contained identical definitions of the term "Receipts" and identical sections 2.11 and 3.1.

114.    At all times relevant to this Complaint, CBSG was aware that Ms. Hill and Network Salon were repeat customers of various MCA providers, including Fast Advance.

115.    In connection with each CBSG Agreement, Ms. Hill was required to execute a Confession of Judgment on her own behalf as well as for Network Salon.

116.    Each of the first six CBSG Agreements included an addendum similar to the FAF Addendum (the "**CBSG Addendum**"). Beginning on September 22, 2015, the date of the First LQD Loan Agreement, the CBSG Addendum was omitted from the CBSG Agreements.

**J.    Terms of the Agreements**

117.    Section 1.10 of each Agreement provides that Network Salon's payments "shall be conditioned upon [Network Salon's] sale of products and services and the payment therefore (*sic*) by [Network Salon]'s customers in the manner provided in Section 1.1.

118.    Sections 1.1 and 1.2 of the Agreements provide payments shall be deducted from "settlement amounts which would otherwise be due to [Network Salon] for electronic check transactions."

119.    In connection with each Agreement, Network Salon was required to grant either CBSG or Fast Advance security interests in all its assets.

120.    In connection with each Agreement, Ms. Hill was required to grant a personal guaranty.

121.    In connection with each Agreement, Ms. Hill was required to execute a Confession of Judgment on her own behalf as well as for Network Salon.

122.    In the Agreements, Fast Advance and CBSG purported to purchase Network Salon's future accounts receivable due to Network Salon's sale of goods and services.

**K.    The CBSG Account**

123.    From March 30, 2015 through September 22, 2015, CBSG made all its deposits to and ACH debits from the Operating Account, held at 5/3.

124.   On or about September 17, 2015, CBSG required Ms. Hill to open a new account, ending in the numbers 7802, at BMO (the "**CBSG Account**"), rather than 5/3, to conceal CBSG's transactions with Network Salon from LQD and from other MCA Providers who had online access to the Network Salon accounts at 5/3. A copy of the CBSG Account Statements from September 2015 through March 2016, indicating that the account was opened on September 17, 2015, is attached as **Group Exhibit R**.

125.   On September 22, 2015, Ms. Hill sent the email attached as **Exhibit S** to Joseph McElhone at the email address joemack888@aol.com, telling him that she had opened the CBSG Account and providing online access information.[4]

126.   Mr. McElhone responded, "Great job!" and told Ms. Hill that he "liked" her for $150,000. *See* Exhibit S.

127.   On September 22, 2015, the date of the First LQD Loan Agreement, CBSG and Network Salon entered into an MCA Agreement in which CBSG purported to purchase $284,000 of Network Salon's "Receipts" for $200,000 (defined in paragraph 194, below, as the "**Seventh CBSG Agreement**").

128.   On September 23, 2015, CBSG deposited $198,432 into the CBSG Account and, from that time on, made all its daily debits from the CBSG Account.

**L.  Network Salon MCA Transactions from March 2015 through Aril 2016**

*March 2015 Transactions*

129.   In the MCA agreement between Network Salon and CBSG dated March 26, 2015, (the "**First CBSG Agreement**"), and while the First Fast Advance Agreement was in effect,

---

[4] Although the Trustee requested all "correspondence or other Communications between Network [Salon] or Anthia R. Hill and the Defendant dated or that occurred within the four years leading up to the Petition Date," CBSG did not produce this email.

CBSG purported to pay off World Global and New Era in the respective amounts of $15,980 and $37,673.00[5], for a total of $53,653, in exchange for Network Salon's promise to pay $76,187.26.

130.     On March 30 and 31, 2015, CBSG debited the Operating Account $856.26. Beginning April 1, 2015, CBSG debited the Operating Account $865.76 each business day. *See* Ex. L, March 2015 Operating Account Statement.

131.     Prior to entering into the First CBSG Agreement, CBSG was aware that Network Salon already owed money to other MCA providers, including Fast Advance, and was making payments from the Operating Account to MCA providers Fast Advance, World Global Finance, LLC, and New Era Lending in the total daily amount of $3,161. *See* Exs. K-L, February and March 2015 Operating Account Statements.

*April 2015 Transactions*

132.     On April 16, 2015, while the First Fast Advance Agreement was in effect, Network Salon entered into an MCA agreement with Cap Call in which Cap Call purported to advance $37,000 to Bathhouse in exchange for a total of $55,130 to be repaid at the "Specified Daily Amount" of $625 every business day (the "**First Bathhouse Agreement**"). Cap Call deposited the proceeds of the First Bathhouse Agreement into the Bathhouse Account.

133.     Cap Call made its debits in connection with the First Bathhouse Agreement from the Bathhouse Account, but CBSG was able to see numerous checks to and from Bathhouse in the Operating Account. *See* Exs. K-M, February-April 2015 Operating Account Statements.

134.     On April 21, 2015, while the First Fast Advance Agreement was in effect, Network Salon and CBSG entered into an MCA agreement in which CBSG purported to pay off $61,460 of

---

[5] The document produced by CBSG is illegible.

Network Salon's existing debt and to advance $70,000 to Network Salon in exchange for Network

Salon's promise to pay $186,687.40 (the "**Second CBSG Agreement**").

135.    On April 23, 2015, CBSG began debiting the Operating Account $1,553.73 each

business day. *See* Ex. K, April 2015 Operating Account Statement.

136.    Prior to entering into the Second CBSG Agreement, CBSG was aware that

Network Salon already owed money to Fast Advance and was making daily payments from the

Operating Account to Fast Advance in the amount of $1,590.

*May 2015 Transactions*

137.    On information and belief, on or about May 11, 2015, while the Second Fast

Advance Agreement and the Second CBSG Agreement were in effect, Network Salon entered into

a new MCA agreement with World Global (the "**Second World Global Agreement**").

138.    On information and belief, on May 11, 2015, World Global deposited $57,460 into

the Operating Account. CBSG was aware of this deposit through its online access to the Operating

Account. *See* Ex. N, May 2015 Operating Account Statement.

139.    Also on May 11, 2015, World Global began debiting the Operating Account $883

each business day. CBSG was aware of these debits through its online access to the Operating

Account. *See id.*

140.    On May 26, 2015, and while the Second Fast Advance Agreement and the Second

World Global Agreement were in effect, Network Salon and CBSG entered into an MCA

agreement in which CBSG purported to advance $60,000 to Network Salon in exchange for

Network Salon's promise to pay $84,000 (the "**Third CBSG Agreement**").

141.    On information and belief, on May 27, 2015 CBSG deposited $58,732.00 into the

Operating Account. *See id.*

142.    On May 29, 2015, CBSG began debiting the Operating Account $840 each business day in addition to the $1,553.73 it was already debiting in connection with the Second CBSG Agreement. *See id.*

143.    On May 28, 2015, while the Second Fast Advance Agreement, the Third CBSG Agreement, and the Second World Global Agreement were in effect, Network Salon entered into an additional MCA agreement with Cap Call in which Cap Call purported to advance $60,000 to Bathhouse in exchange for a total of $89,400 to be repaid at the "Specified Daily Amount" of $899 every business day.

### *June 2015 Transactions*

144.    On June 3, 2015, while the Second Fast Advance Agreement, the Third CBSG Agreement, and the Second World Global Agreement were in effect, Network Salon entered into a new MCA agreement with Yellowstone in which Yellowstone purported to purchase $116,000 of Network Salon's receivables for $80,000 (the "**June 2015 Yellowstone Agreement**").

145.    On June 5, 2015, Yellowstone deposited $71,000 into the Yellowstone Account. CBSG and Fast Advance were both able to see this deposit through their online access to Network Salon's accounts. *See* Ex. O, June 2015 Yellowstone Account Statement.

146.    On June 5, 2015, Yellowstone began debiting the Yellowstone Account $1,199 each business day. CBSG and Fast Advance were both able to see these debits through their online access to Network Salon's accounts. *See id.*

147.    On June 15, 2015, while the Second Fast Advance Agreement, the Second World Global Agreement, and the June 2015 Yellowstone Agreement were in effect, Network Salon and CBSG entered into an MCA agreement in which CBSG purported to pay off $73,920 of Network Salon's existing debt and to advance $60,000 to Network Salon in exchange for Network Salon's promise to pay $187,488 (the **Fourth CBSG Agreement**").

148.    On June 17, 2015, CBSG began debiting the Operating Account $1,874.88 each business day in addition to the $1553.73 it was already debiting in connection with the Second CBSG Agreement. *See* June 2015 Operating Account Statement, attached as **Exhibit T**.

*July 2015 Transactions*

149.    On July 3, 2015, while the Second Fast Advance Agreement, the Second World Global Agreement, and the June 2015 Yellowstone Agreement were in effect, Network Salon and CBSG entered into an MCA agreement in which CBSG purported to pay off $106,479 of Network Salon's existing debt and to advance $80,000 to Network Salon in exchange for Network Salon's promise to pay $261,070 (the "**Fifth CBSG Agreement**").

150.    On information and belief, on July 3, 2105, CBSG deposited $78,732 to the Operating Account. *See* July 2015 Operating Account Statement, attached as **Exhibit U**.

151.    On July 6, 2015, CBSG began debiting the Operating Account $2,373.37 each business day in addition to the $1,874.88 it was already debiting in connection with the Fourth CBSG Agreement. *See id.*

152.    On July 9, 2015, while the Second Fast Advance Agreement, including the Addendum, the Fifth CBSG Agreement, including the CBSG Addendum, the Second World Global Agreement, and the June 2015 Yellowstone Agreement were in effect, Network Salon, through Bathhouse, entered into a new MCA agreement with Cap Call, in which Cap Call purported to advance $110,000 to Bathhouse in exchange for a total of $163,900 to be repaid at the "Specified Daily Amount" of $1,399 every business day (the "**July 2015 Cap Call Agreement**").

153.    Despite its July MCA advances from CBSG and Cap Call, in July 2015, Network Salon was unable to make its required daily payments to CBSG. *See id.*

154.     From July 14, 2015 through August 3, 2015, CBSG's two daily debits to the Operating Account changed to $1,000 and $1,500, respectively. On August 3, 2015, CBSG resumed two daily debits in the respective amounts of $1,74.88 and $2,373.37. *See id.*

*August 2015 Transactions*

155.     In August 2015, Network Salon's capitalization problems increased. The Operating Account was substantially overdrawn on ten of the twenty-one business days in August 2015. 5/3 returned multiple checks and ACH debits drawn on the Operating Account. *See* Ex. P. August 2015 Operating Account Statement.

156.     On August 3, 2015, the Operating Account was overdrawn by $34,926.45. 5/3 paid eleven items for Network Salon, including the Fast Advance and CBSG debits of $1,74.88 and $2,373.37. *See id.*

157.     On August 4, 2015, CBSG debited the Operating Account for $1,000 in addition to the daily debits of $1,74.88 and $2,373.37. *See id.*

158.     On August 4, 2015, despite a $40,000 deposit from the Bathhouse Account, the Operating Account was overdrawn by $18,138.74. 5/3 paid all three CBSG items for that day but returned the two Fast Advance debits. *See id.*

159.     On August 5, 2015, CBSG made two debits to the Operating Account in the amounts of $937.44 and $1,186.69, respectively, and Fast Advance made one debit in the amount of $1,106.49. These amounts equal half of Network Salon's scheduled payments. *See id.*

160.     Network Salon continued to make half-payments to Fast Advance and CBSG through August 14, 2015, when it entered into the Third Fast Advance Agreement. *See* Ex. P, August 2015 Operating Account Statement.

161.     On August 7, 2015, despite a $20,000 deposit from the Bathhouse Account on August 6, 2015 and a $19,000 deposit from the Bathhouse Account on August 7, 2015, the

Operating Account was overdrawn by $64,340.32. 5/3 covered numerous items for Network Salon, including the half-payment debits from Fast Advance and CBSG. *See id.*

162.    On August 13, 2015, despite a $5,000 transfer from the Bathhouse Account on August 12, 2015 and a $4,000 transfer from the Bathhouse Account on August 13, 2015, the Operating Account was overdrawn by $13,586.52. *See id.*

163.    On August 13, 2015, 5/3 returned the $1,186.69 CBSG debit and the $1,106.49 Fast Advance debit but paid the $937.44 CBSG debit. *See id.*

164.    On August 17, 2015, Network Salon continued half-payments to CBSG, but Fast Advance began daily debits of $1,488.67 to the Operating Account in connection with the Third Fast Advance Agreement. *See id.*

165.    On August 17, 2015, while the Third Fast Advance Agreement, the Fourth and Fifth CBSG Agreements, the Second World Global Agreement, and the July 2015 Cap Call Agreement were in effect, Network Salon entered into a new MCA agreement with Yellowstone in which Yellowstone purported to purchase $117,500 of Network Salon's receivables for $171,000 (the "**August 2015 Yellowstone Agreement**").

166.    On August 18, 2015, Yellowstone deposited $55,000 to the Yellowstone Account and began debiting the Yellowstone Account $1,725 each business day. A copy of the August 2015 Yellowstone Account Statement is attached as **Exhibit V**. Through their online access to the Yellowstone Account, Fast Advance and CBSG were able to see the deposit and the debits.

167.    On August 18, 2015, Ms. Hill transferred $40,000 from the Yellowstone Account to the Operating Account. *See* Ex. P, August 2015 Operating Account Statement.

168.    On August 18, 2015, CBSG made two half-payment debits and an additional debit of $1,261.69. *See id.*

169.    On August 19, 2015, despite a $10,000 transfer from the Yellowstone Account and a $7,000 transfer from the Bathhouse Account[6], the Operating Account was overdrawn by $8,304.22. *See id.*

170.    On August 19, 2015, CBSG made two half-payment debits and Fast Advance made a debit of $1,488.67. 5/3 paid the two CBSG debits and the Fast Advance debit. *See id.*

171.    On August 20, 2015, despite an $8,000 transfer from the Bathhouse Account[7], the Operating Account was overdrawn by $5,064.99. *See id.*

172.    On August 20, 2105, CBSG made two half-payment debits and Fast Advance made a debit of $1,488.67. 5/3 paid the two CBSG debits and the Fast Advance debit. *See* Ex. P, August 2015 Operating Account Statement.

173.    On August 21, 2015, despite a $14,000 transfer from the Bathhouse Account[8], the Operating Account had a balance of $331.08. *See id.*

174.    On August 24, 2015, the Operating Account was overdrawn by $1,425.19.

175.    On August 24, 2015, CBSG made two half-payment debits and Fast Advance made a debit of $1,488.67. 5/3 paid the two CBSG debits and the Fast Advance debit. *See id.*

176.    On August 25, 2015, the Operating Account was overdrawn by $2,607.56. *See id.*

177.    On August 25, 2015, CBSG made two half-payment debits and Fast Advance made a debit of $1,488.67. 5/3 returned the two CBSG debits but paid the Fast Advance debit. *See id.*

178.    On August 26, 2015, the Operating Account was overdrawn by $4,244.23. *See* Ex. P, August 2015 Operating Account Statement.

---

[6] 5/3 returned this item unpaid on August 20, 2015 and charged the Operating Account $7,000.
[7] 5/3 returned this item unpaid on August 21, 2015 and charged the Operating Account $8,000.
[8] 5/3 returned this item unpaid on August 24, 2015 and charged the Operating Account $14,000.

179.    On August 26, 2015, CBSG made two half-payment debits and Fast Advance made a debit of $1,488.67. 5/3 paid the two CBSG debits and the Fast Advance debit. *See id.*

180.    On August 27, 2015, the Operating Account was overdrawn by $ 14,354.20. *See id.*

181.    On August 27, 2015, CBSG made two half-payment debits and Fast Advance made a debit of $1,488.67. 5/3 paid the two CBSG debits and the Fast Advance debit. *See id.*

182.    On August 28, 2015, CBSG made two half-payment debits and Fast Advance made a debit of $1,488.67. The debits were paid without creating overdrafts. *See id.*

183.    On August 31, 2015, Ms. Hill deposited a $10,250 check from her mother, Paula Walker, in the Operating Account. *See* Ex. P, August 2015 Operating Account Statement.

184.    On August 31, 2015, CBSG made two half-payment debits and Fast Advance made a debit of $1,488.67. The debits were paid without creating overdrafts. *See id.*

*September 2015 Transactions*

185.    In September 2015, World Global, CBSG, and Fast Advance continued to debit daily from the Operating Account. *See*, September 2015 Operating Account Statement, attached as **Exhibit W**. Yellowstone continued to debit from the Yellowstone Account and Cap Call continued to debit from the Bathhouse Account.

186.    From September 1, 2015 through September 4, 2015, CBSG continued to make daily half-debits and Fast Advance continued to debit $1,488.67 each business day. *See id.*

187.    On September 3, 2015, while the Second Fast Advance Agreement, the Fourth and Fifth CBSG Agreements, the Second World Global Agreement, the June 2015 Yellowstone Agreement, and the July 2015 Cap Call Agreement were in effect, Network Salon and CBSG entered into an MCA agreement in which CBSG purported to advance $100,000 to Network Salon in exchange for Network Salon's promise to pay $140,000 (the "**Sixth CBSG Agreement**").

188.    On information and belief, on September 3, 2015, CBSG deposited $98,432 into the Operating Account. *See id.*

189.    On September 4, 2015, CBSG debited $1,400 from the Operating Account in addition to two half-debits. *See id.*

190.    On September 8, 2015, CBSG began to debit the full amount in connection with the Fourth and Fifth CBSG Agreements, so that from September 8, 2015 through September 13, 2015, CBSG made three daily debits to the Operating Account in the respective amounts of $1,400, $1,874.88, and $2,373.37. Fast Advance continued to make daily debits of $1,488.67. *See id.*

191.    By September 11, 2015, the $98,432 advance from the Sixth CBSG Agreement was gone and the Operating Account was overdrawn by $7.89. *See* Ex. V, September 2015 Operating Account Statement.

192.    On September 14, 2015, CBSG returned to half-debits on the Fourth and Fifth CBSG Agreements and debited $1,400 on account of the Sixth CBSG Agreement. Fast Advance made its daily debit of $1,488.67. The debits continued in these amounts through September 22, 2015, the date of the First LQD Agreement. *See id.*

193.    Yellowstone continued to debit the Yellowstone Account and Cap Call continued to debit the Bathhouse account throughout September 2015.

194.    As discussed in paragraph 127, above, on September 22, 2015, the same date as the First LQD Agreement, and with full knowledge of the First LQD Agreement and its prohibitions, Network Salon and CBSG entered into an MCA agreement in which CBSG purported to purchase $284,000 of Network Salon's receivables in exchange for Network Salon's promise to pay $284,000 (the "**Seventh CBSG Agreement**"). The Seventh CBSG Agreement specifies that CBSG would debit the "Specific Daily Amount" of $2,151.52 from Network Salon.

195.     On September 23, 2015, CBSG deposited $198,432 into the CBSG Account and, from that time on, made all its daily debits from the CBSG Account. *See* Ex. R, CBSG Account Statements.

196.     CBSG was also able to see that Yellowstone's debits continued in the Yellowstone Account and that World Global's debits continued in the Operating Account.

197.     Although the Seventh CBSG Agreement makes no reference to any debits other than the specified $2,151.52, on September 23, 2015, CBSG also began to debit $1,400 daily from the CBSG Account. On information and belief, CBSG and Network Salon concealed the debt owing in connection with the Sixth CBSG Agreement from LQD and transferred its $1,400 "Specific Daily Amount" to the CBSG Account. *See id.*

198.     On September 25, 2015, CBSG began additional daily debits of $2,151.52 to the CBSG Account. *See id.*

199.     Although CBSG conducted all its Network Salon transactions from September 23, 2015 through the Petition Date in the CBSG Account, it retained its online access to certain of Network Salon's accounts at 5/3, including the Operating Account and the Yellowstone Account.

*October 2015 Transactions*

200.     On October 1, 2015, Bathhouse entered into a new MCA Agreement with Cap Call in which Cap Call purported to advance $75,000 to Bathhouse in exchange for a total of $112,425 to be repaid at the "Specified Daily Amount" of $995 every business day.

201.     On October 2, 2015, Cap Call deposited $74,295.00 into the Bathhouse Account.

202.     On October 2, 2015 Network Salon transferred $52,000 from the Bathhouse Account to the Operating Account. *See* October 2015 Operating Account Statement, attached as **Exhibit X**.

203.    From October 1, 2105 through October 22, 2015, CBSG made two daily debits from the CBSG Account in the amounts of $1,400 and $2,151.52, respectively. *See* Ex. R, CBSG Account Statements.

204.    By October 2, 2015, after a transfer of $5,000 from the Operating Account, the CBSG Account, which had a balance of $198,432 following CBSG's deposit on September 23, 2015, was down to $9,324.50. *See id.*

205.    On October 5, 2015, Network Salon entered into an MCA agreement with Evolution Capital Group ("**Evolution**") in which Evolution purported to purchase $186,300 of Network Salon's receivables for $135,000. On October 14, 2015, Evolution deposited $55,574.22 to the Network Salon account at 5/3 ending in the numbers 0914 (the "**Evolution Account**").

206.    Although Ms. Hill transferred an additional $18,000 to the CBSG Account from October 8, 2015 through October 14, 2015, on October 20, 2015, the CBSG Account was overdrawn and the bank returned CBSG's two daily debits. *See id.*

207.    Nevertheless, on October 21, 2015, and with full knowledge of the First LQD Agreement and its prohibitions, as well as certain of Network Salon's existing MCAs, Network Salon and CBSG entered into an MCA agreement in which CBSG purported to pay off existing debt in the amount of $245,272.64 and to purchase an additional $100,000 of Network Salon's receivables in exchange for Network Salon's promise to pay $483,381.69 (the "**Eighth CBSG Agreement**"). The Eighth CBSG Agreement specifies that CBSG would debit the "Specific Daily Amount" of $3,554.28 from Network Salon.

208.    On October 21, 2015, CBSG deposited $98,432 into the CBSG Account. *See id.*

209.    On October 22, 2015, CBSG made three debits to the CBSG Account in the amounts of $1,400, $1,475, and $3,554.28, respectively. *See id.*

210.    Through October 30, 2015, CBSG continued to make daily debits to the CBSG Account in the respective amounts of $1,400 and $3,554.28. *See* Ex. R, CBSG Account Statements.

211.    The CBSG Account had a closing balance of $165.33 on October 30, 2015. *See id.*

*November 2015 Transactions*

212.    From November 2, 2015 through November 18, 2015, CBSG made two daily debits to the CBSG Account in the respective amounts of $1,400 and $3,554.28. *See* Ex. R, CBSG Account Statements.

213.    On November 2, 2015, Network Salon transferred $10,000 from the Operating Account from the CBSG Account. *See* Exs. R, CBSG Account Statements and November 2015 Operating Account Statement, attached as **Exhibit Y**.

214.    On November 3, 2015, Network Salon entered into an MCA agreement with LG Funding, LLC ("**LG**")[9] in which LG purported to purchase $104,452 of Network Salon's receivables for $75,690. On November 6, 2015, LG deposited $75,000 into the Network Salon Account ending in the numbers 2255 (the "**LG Account**").

215.    On November 4, 2015, Network Salon deposited $10,000 to the CBSG Account. *See* Ex. R, CBSG Account Statements.

216.    On November 6, 2015, Network Salon transferred $55,000 from the LG Account to the Operating Account. *See* Ex. Y, November 2015 Operating Account Statement.

217.    On November 6, 2015, Network Salon transferred $10,000 from the Operating Account into the CBSG Account. *See* Exs. R and Y, CBSG Account Statements and November 2015 Operating Account Statement.

_____

[9] LG is the defendant in related Adversary Case No. 17-00072.

218.    On November 9, 2015 Network Salon made a $5,000 deposit to the CBSG Account. On November 10, 2105, Network Salon made a $5,000 deposit to the CBSG Account. *See* Ex. R, CBSG Account Statements.

219.    On November 16, 2015, BMO returned both CBSG debits unpaid. *See id.*

220.    On November 17, 2015, CBSG made two debits to the CBSG in the amounts of $1,400 and $3,554.28, respectively. *See id.*

221.    On November 18, 2015, CBSG made four debits to the CBSG Account, in the amounts of $1,400, $1,475, $3,554.28, and $3,629.28, respectively. *See id.*

222.    On November 19, 2015, and with full knowledge of the First LQD Agreement and its prohibitions, as well as certain of Network Salon's existing MCAs, Network Salon and CBSG entered into an MCA agreement in which CBSG purported to pay off existing debt in the amount of $68,600 and to purchase an additional $100,000 of Network Salon's receivables in exchange for Network Salon's promise to pay $236,040 (the "**Ninth CBSG Agreement**"). The Ninth CBSG Agreement specifies that CBSG would debit the "Specific Daily Amount" of $2,360.40 from Network Salon.

223.    On November 19, 2015, CBSG made two debits from the CBSG Account, in the amounts of $1,400 and $3,554.28, respectively. *See id.*

224.    On November 20, 2015, CBSG deposited $98,432 to the CBSG Account. *See* Ex. R, CBSG Account Statements.

225.    On November 23 and 24, 2015, CBSG made debits of $3,554.28 and $2,360 to the CBSG Account. *See id.*

226.    On November 25, 2015, LQD deposited $156,885.59 to the Operating Account in connection with the Second LQD Agreement. *See* Ex. C, Second LQD Loan Agreement and Ex. Y, November 2015 Operating Account Statement.

227.    On November 27 and 30, CBSG made debits of $3,554.28 and $2,360.40 to the CBSG Account. *See* Ex. R, CBSG Account Statements.

228.    The CBSG Account closed with a balance of $7,463.74 on November 30, 2015. *See id.*

### *December 2015 Transactions*

229.    By December 2015, none of Network Salon's MCA transactions were processed through the Operating Account. *See* December 2015 Operating Account Statement, attached as **Exhibit Z**.

230.    From December 1, 2015 through December 18, 2015, Ms. Hill made fourteen teller deposits to the CBSG Account in amounts ranging from $4,500 to $6,700, maintaining a daily balance of approximately $6,000 after CBSG took its daily debits of $3,554.28 and $2,360.40. *See* Ex. R., CBSG Account Statements.

231.    On December 10, 2015, Network Salon and Cap Call entered into a new MCA agreement in which Cap Call purported to advance $185,000 to Network Salon in exchange for a total of $277,315 to be repaid at the "Specific Daily Amount" of $2,300.

232.    On December 11, 2015, Cap Call deposited $67,756.50 to the Bathhouse Account.

233.    On or around December 11, 2015, Network Salon entered into a new MCA agreement with Evolution. On December 11, 2015, Evolution deposited $47,880.00 in the Evolution Account.

234.    On December 14, 2015, Network Salon and Yellowstone entered into an MCA agreement in which Yellowstone purported to purchase $219,000 of Network Salon's receivables for $150,000. On December 15, 2015, Yellowstone deposited $79,423 to the Yellowstone Account. *See* December 2015 Yellowstone Account Statement, attached as **Exhibit AA**.

235.    Through its online access to the Yellowstone Account, CBSG was able to see Yellowstone's December 15, 2015 deposit as well as its subsequent debits. *See id.*

236.    On December 18, 2015, and with full knowledge of the First and Second LQD Agreements and their prohibitions, as well as certain of Network Salon's existing MCAs, Network Salon and CBSG entered into an MCA agreement in which CBSG purported to pay off existing debt in the amount of $189,793.60 and to purchase an additional $75,000 of Network Salon's receivables in exchange for Network Salon's promise to pay $370,711.04 (the "**Tenth CBSG Agreement**"). The Tenth CBSG Agreement specifies that CBSG would debit the "Specific Daily Amount" of $3,141.62 from Network Salon.

237.    On December 21, 2015, CBSG deposited $73,432 to the CBSG Account. *See* Ex. R, CBSG Account Statements.

238.    On December 21, 2015, CBSG made debits of $3,554.28 and $2,360.40 to the CBSG Account. *See id.*

239.    From December 22, 2015 through December 31, 2015, CBSG made two daily debits to the CBSG Account in the amounts of $3,554.28 and $3,141.62, respectively. *See id.*

240.    On December 29, 2015, the CBSG Account was overdrawn by $3,494.68. On December 30, 2015, the bank returned CBSG's debit of $3,554.28. *See id.*

241.    The CBSG Account had a closing balance of $2,133.21 on December 31, 2015. *See id.*

### *January 2016 Transactions*

242.    On January 4, 2016, the first business day of the new year, the CBSG Account was overdrawn by $12,706.87. On January 8, 2016, the CBSG Account was overdrawn by $2,609.47. *See* Ex. R, CBSG Account Statements.

243.    In January 2016, Network Salon bounced several checks, both those written on the CBSG Account and those deposited to the CBSG Account. *See id.*

244.    On January 4, 2016, CBSG made three debits to the CBSG Account in the amounts of $3,141.62, $3,554.28, and $3,629.28, respectively. *See id.*

245.    From January 5, 2016 through January 15, 2016, CBSG made two daily debits to the CBSG Account in the amounts of $3,554.28 and $3,141.62, respectively. *See id.*

246.    On January 8, 2016, Network Salon entered into a new MCA Agreement with LG in which LG purported to purchase $71,979.80 of Network Salon's receivables for $50,690. On January 12, 2016, LG deposited $50,000 into the LG Account.

247.    BMO returned CBSG's January 11, 2016 debit for $3,554.28 unpaid. *See id.*

248.    On January 15, 2016, Network Salon entered into an MCA Agreement with Crestview Financial, LLC ("**Crestview**")[10], in which Crestview purported to purchase $290,000 of Network Salon's receivables for $290,000.

249.    On January 19, 2106, Crestview deposited $198,375 into the Network Salon account ending in the numbers 1000 (the "**Crestview Account**").

250.    On January 19, 2016, CBSG made four debits to the CBSG Account, in the amounts of $3,141.62, $3,554.28, $3,629.28, and $3,704.28, respectively. *See* Ex. R, CBSG Account Statements.

251.    On January 21, 2016, Network Salon entered into an MCA Agreement with Pearl Beta Funding, LLC ("**Pearl**") in which Pearl purported to purchase $75,000 of Network Salon's receivables for $50,336. On January 25, 2016, Pearl deposited $ 47,338 into the Network Salon Account ending in the numbers 1042 (the "**Pearl Account**").

---

[10] Crestview is the defendant in related Adversary Case No. 17-00068.

252.    On January 21 and 22, 2016, CBSG made two daily debits to the CBSG Account in the amounts of $3,554.28 and $3,141.62, respectively. *See id.*

253.    On or around January 25, 2016, Network Salon entered into an MCA Agreement with DLG ADV, LLC d/b/a Entrepreneur Now ("**DLG**"). On January 25, 2016, DLG deposited $48,705.00 into the Network Salon account ending in the numbers 7042 (the "**DLG Account**").

254.    On January 25, 2016, CBSG made three debits to the CBSG Account in the amounts of $3,141.62, $3,554.28, and $3,216.62, respectively. *See id.*

255.    On January 26 and 27, 2015, CBSG made two daily debits to the CBSG Account in the amounts of $3,554.28 and $3,141.62, respectively. *See id.*

256.    On January 26, 2016, and with full knowledge of the First and Second LQD Agreements and their prohibitions, as well as certain of Network Salon's existing MCAs, Network Salon and CBSG entered into an MCA agreement in which CBSG purported to pay off existing debt in the amount of $266,853.57 and to purchase an additional $100,000 of Network Salon's receivables in exchange for Network Salon's promise to pay $498,900.45 (the "**Eleventh CBSG Agreement**"). The Eleventh CBSG Agreement specifies that CBSG would debit the "Specific Daily Amount" of $3,991.20 from the CBSG Account.

257.    On January 27, 2016, CBSG deposited $98,432 into the CBSG Account. *See* Ex. R, CBSG Account Statements.

258.    On January 28 and 29, 2016, CBSG made daily debits to the CBSG Account in the amounts of $3,141.62 and $3,991.20, respectively. *See id.*

259.    On January 29, 2016, the CBSG Account had a closing balance of $28,273.72. *See id.*

*February 2016 Transactions*

260.     From February 1, 2016 through February 8, 2016, CBSG made two daily debits to the CBSG Account in the respective amounts of $3,141.62 and $3,991.20. *See id.*

261.     On February 3, 2016, Network Salon entered into an additional MCA agreement with Evolution in which Evolution purported to purchase $253,750 of Network Salon's receivables for $175,000. On February 4, 2016, Evolution deposited $110,080.76 into the Evolution Account.

262.     On February 5, 2016, and with full knowledge of the First and Second LQD Agreements and their prohibitions, as well as certain of Network Salon's existing MCAs, Network Salon and CBSG entered into an MCA agreement in which CBSG purported to purchase an additional $175,000 of Network Salon's receivables for $125,000 (the "**Twelfth CBSG Agreement**"). The Twelfth CBSG Agreement specifies that CBSG would debit the "Specific Daily Amount" of $1,750 from the CBSG Account.

263.     On February 5, 2016, CBSG deposited $123,432 to the CBSG Account. *See id.*

264.     From February 8, 2016 through February 18, 2016, CBSG made three daily debits to the CBSG Account in the respective amounts of $1,750, $3,141.62, and $3991.20. *See* Ex. R, CBSG Account Statements.

265.     On February 10, 2016, Network Salon entered into an additional MCA Agreement with Cap Call in which Cap Call purported to purchase $111,750 of Network Salon's receivables for $75,000. On February 12, 2016, Cap Call deposited $73,490.00 to the Bathhouse Account.

266.     On February 17, 2016, Network Salon entered into a new MCA agreement with Yellowstone, in which Yellowstone purported to purchase $277,400 of Network Salon's receivables for $190,000. On February 19, 2016, Yellowstone deposited $60,182.50 into the

Yellowstone Account. *See* February 2016 Yellowstone Account Statement, attached as **Exhibit BB**.

267.    CBSG was able to see the February 19, 2016 Yellowstone deposit and subsequent debits through its access to the Yellowstone Account. *See id.*

268.    On February 18, 2016, and with full knowledge of the First and Second LQD Agreements and their prohibitions, as well as certain of Network Salon's existing MCAs, Network Salon and CBSG entered into an MCA agreement in which CBSG purported to pay off Network Salon's existing debt in the amount of $250,877.46 and to purchase an additional $100,000 of Network Salon's receivables for $491,228.44 (the "**Thirteenth CBSG Agreement**"). The Thirteenth CBSG Agreement specifies that CBSG would debit the "Specific Daily Amount" of $3,993.73 from the CBSG Account.

269.    On February 18, 2016, CBSG deposited $98,432 to the CBSG Account. *See* Ex. R, CBSG Account Statements.

270.    From February 19, 2016 through February 26, 2016, CBSG made three daily debits to the CBSG Account in the respective amounts of $1,750, $3,991.20, and $3,993.73. *See id.*

271.    On February 25, 2016, and with full knowledge of the First and Second LQD Agreements and their prohibitions, as well as certain of Network Salon's existing MCAs, Network Salon and CBSG entered into an MCA agreement in which CBSG purported to pay off $415,522 of Network Salon's existing debt and to purchase an additional $75,000 of Network Salon's receivables for $632,773.60 (the "**Fourteenth CBSG Agreement**"). The Fourteenth CBSG Agreement specifies that CBSG would debit the "Specific Daily Amount" of $4,519.81 from the CBSG Account.

272.    From February 26, 2016 through February 29, 2016 CBSG made three daily debits from the CBSG Account in the respective amounts of $1,750, $3993.73, and $4,519.81. *See id.*

273.  On February 29, 2016, Ms. Hill borrowed $20,000 from her friend Robert Mack and deposited it to the Operating Account.

274.  On February 29, 2016, Network Salon entered into a new MCA agreement with Knight in which Knight purported to purchase $67,500 of Network Salon's receivables for $50,000. On March 3, 2016, Knight deposited $49,000 into the Network Salon account ending in the numbers 6636 (the "**6636 Account**").

275.  The CBSG Account had a closing balance of $8,103.20 on February 29, 2016. *See id.*

<u>*March 2016 Transactions*</u>

276.  From March 1, 2016 through March 21, 2016, CBSG made three daily debits to the CBSG Account in the respective amounts of $1,750, $3993.73, and $4,519.81. *See id.*

277.  On March 3, 2016, Network Salon entered into an MCA agreement with Last Chance Funding, Inc. ("**Last Chance**") in which Last Chance purported to purchase $73,500 of Network Salon's receivables for $50,000. On March 9, 2016, Last Chance deposited $48,575 into the 6636 Account.

278.  On March 11, 2016, Network Salon entered into a new MCA agreement with Cap Call in which Cap Call purported to purchase $298,000 of Network Salon's receivable for $200,000.

279.  On March 15, 2018, Cap Call deposited $59,965 into the Bathhouse Account.

280.  On March 21, 2016, and with full knowledge of the First and Second LQD Agreements and their prohibitions, as well as certain of Network Salon's existing MCAs, Network Salon and CBSG entered into an MCA agreement in which CBSG purported to pay off $403,366.38 of Network Salon's existing debt and to purchase an additional $100,000 of Network Salon's receivables for $704,712.93 (the "**Fifteenth CBSG Agreement**"). The Fifteenth CBSG

Agreement specifies that CBSG would debit the "Specific Daily Amount" of $5,505.57 from the CBSG Account.

281. On March 21, 2016, CBSG deposited $98,432 to the CBSG Account. *See* Ex. R, CBSG Account Statements.

282. From March 22, 2016 through March 31, 2016, CBSG made three daily debits to the CBSG Account in the respective amounts of $1,750, $4,519.81, and $5,505.57. *See id.*

**M. Failure and Foreclosure**

283. By April 4, 2016, all of Network Salon's accounts were overdrawn or had *de minimus* balances.

284. On April 7, 2016, LQD commenced a foreclosure action against Network Salon in the Circuit Court of Cook County, Illinois.

285. On April 11, 2016 LQD obtained judgment in its favor and an order for possession.

286. LQD subsequently operated a beauty supply entity named Source Beauty from the former Network Salon premises located at 229 West 18th Street, Chicago, IL 60616.

287. Source Beauty hired Ms. Hill as a consultant and she worked part-time for Source Beauty until the business closed in May 2018.

**N. CBSG's Reaction**

288. On information and belief, after March 31, 2016 and on or prior to April 5, 2016, various agents, principals, and/or employees of CBSG attempted to contact Ms. Hill by telephone to discuss Network Salon's payment status.

289.    On April 5, 2016, Susan Graeser, a CBSG underwriter[11], sent Ms. Hill the email attached as **Exhibit CC**, telling Ms. Hill that Mr. McElhone was shocked and threatening to take action to collect directly from Network Salon's customers[12].

### *Post-Foreclosure, Pre-Petition*

290.    By April 11, 2016, after Network Salon had ceased operations and had no sales of goods or services, Mr. McElhone was nevertheless sending text messages to Ms. Hill, attempting to collect from her and from Network Salon. *See* Text Message Chain between Mr. McElhone and Ms. Hill from April 11, 2016 through June 29, 2016[13], attached as **Exhibit DD**.

291.    On April 21, 2016, Mr. McElhone called Ms. Hill from his mobile phone but did not leave a message. Ms. Hill then received several calls in a row from CBSG's office. *See* Email from A. Hill to J. Rose and G. Souri dated April 21, 2016, attached as **Exhibit EE**.

### *Post-Petition*

292.    On May 26, 2016, the United States Bankruptcy Court for the Northern District of Illinois served CBSG with notices of the Bankruptcy Cases. The Notices are attached as **Group Exhibit FF**.

293.    On June 29, 2016, Mr. McElhone sent Ms. Hill a text message asking if she was "ready to talk." *See* Text Message from J. McElhone to A. Hill dated June 29, 2016, attached as **Exhibit GG**.[14]

---

[11] CBSG filed to identify Ms. Graeser in its Rule 26 Disclosures.
[12] Although the Trustee requested all "correspondence or other Communications between Network [Salon] or Anthia R. Hill and the Defendant dated or that occurred within the four years leading up to the Petition Date," CBSG did not produce this email.
[13] Although the Trustee requested all "correspondence or other Communications between Network [Salon] or Anthia R. Hill and the Defendant dated or that occurred within the four years leading up to the Petition Date," CBSG did not produce this email.
[14] CBSG did not produce this text message.

294.     On July 14, 2016, Ms. Hill received two telephone calls from "Howard" at CBSG. *See* Email from A. Hill to J. Rose and G. Souri dated July 14, 2016, attached as **Exhibit HH**.

295.     On July 20, 2016 "Joe Macki" sent Ms. Hill an email asking if she was ready to talk yet[15]. *See* July 20, 2016 email from "Joe Macki" to A. Hill, attached as **Exhibit II**.

296.     On January 5, 2017, Ms. Hill was working at Source Beauty. *See* Affidavit of Anthia R. Hill (the "**Hill Affidavit**") at ¶ 4, a copy of which is attached hereto as **Exhibit JJ**.

297.     On that day, a man who identified himself as "Gino from New York" entered the LQD warehouse where Ms. Hill was working. *See* Hill Affidavit at ¶¶ 5, 9.

298.     The man informed Ms. Hill that he was "here from CBSG," and that Ms. Hill "owed [the man's] cousin money." *See* Hill Affidavit at ¶ 7.

299.     Ms. Hill escorted the man to the office of George Souri, LQD's CEO and founder, on the sixth floor of 229 West 18th Street, Chicago, IL 60616. *See* Affidavit of George Souri (the "Souri Affidavit") at ¶¶ 1-3, a copy of which is attached hereto as **Exhibit KK**.

300.     Ms. Hill and Mr. Souri later discovered that the man's name was Gino Gioe. *See* Hill Affidavit at ¶ 9; Souri Affidavit at ¶ 4.

301.     Mr. Gioe held himself out as a representative of CBSG. *See* Souri Affidavit at ¶ 5.

302.     In Mr. Souri's office, Mr. Gioe telephoned Mr. McElhone and placed Mr. McElhone on speakerphone. *See* Souri Affidavit at ¶ 6.

303.     Mr. McElhone began yelling obscenities and demanding repayment of the loans that CBSG made to Network Salon before its bankruptcy filing[16]. *See* Souri Affidavit at ¶ 7.

---

[15] CBSG did not produce this email.

[16] CBSG did not outright deny these facts in its Discovery Responses but stated that it lacked sufficient information to admit or deny (Discovery Responses, Request to Admit Nos. 18-19), even though it identified Mr. McElhone in both the Rule 26 Disclosures and its Responses to the Trustee's Interrogatories.

304.     Mr. Souri informed Mr. McElhone and Mr. Gioe of the pending bankruptcies of

Network Salon and Ms. Hill to which Mr. Gioe stated: "We don't deal with courts, we have our

own ways to collect." *See* Souri Affidavit at ¶ 8.

305.     Mr. Souri showed Mr. Gioe a Court document demonstrating Ms. Hill's and

Network Salon's pending bankruptcy cases. Mr. Gioe responded: "We'll go to her house and deal

with her there." *See* Souri Affidavit at ¶ 9.

306.     During this encounter, Mr. Gioe had a picture of Ms. Hill on his mobile phone[17].

*See* Souri Affidavit at ¶ 10.

307.     Mr. Souri called the Chicago police, but Mr. Gioe left LQD's office prior to their

arrival. *See* Souri Affidavit at ¶ 11.

308.     Based on Mr. Gioe's statements and conduct on January 5, 2017, Mr. Souri felt that

Mr. Gioe was threatening Ms. Hill, and that Mr. Gioe implied that he would do physical harm to

Ms. Hill or her children if she did not repay CBSG. *See* Souri Affidavit at ¶ 13.

309.     Following his visit to Source Beauty, Mr. Gioe left the following voicemail on Ms.

Hill's mobile phone:

> Anthia, it's Gino. Um, that was pretty creative what you did today. And, I called to say you
> should give me call. You and Georgie and this is my number 907-544-6606.
> Have a great day. It was very nice meeting you and hopefully everything works out. But
> give me a call…oh, George, George should give me a call. I would love for him to give me
> a call. Yeah, great day.

310.     Ms. Hill and Mr. Souri have both identified the man featured in the *New York Daily*

*News* article attached as **Exhibit LL** as the man who identified himself as "Gino from New York."

311.     Through their aggressive post-petition collection conduct, CBSG, Mr. McElhone

and Mr. Gioe willfully committed violations of the automatic stay.

---

[17] The transmission of this picture to Mr. Gioe was responsive to the Trustee's Discovery Requests, but CBSG did not
produce it.

312.    CBSG's aggressive post-foreclosure and post-petition collection conduct, after

Network Salon had ceased selling goods and services, is inconsistent with any argument that the

CBSG Transactions were sales of future receivables. CBSG has waived the right to deny that the

CBSG Transactions were loans by attempting to collect its debt after Network Salon had ceased

selling goods and services. CBSG has waived all argument that the CBSG Transactions were

anything other than loans.

**O.  Mr. Gioe's Further Involvement in CBSG Collection Activity**

313.    In its Rule 26 Disclosures, dated January 29, 2018, CBSG listed Mr. Gioe with an

unknown address, describing him as "investigator retained at one time by CBSG." *See* Rule 26

Disclosures.

314.    In its Discovery Responses, CBSG denied that Mr. Gioe went to Source Beauty on

CBSG's instructions. CBSG further claimed to lack sufficient information to admit or deny any of

the Trustee's Discovery Requests regarding Mr. Gioe. *See* Discovery Responses, Requests to

Admit Nos. 15-17.

315.    However, CBSG remains in touch with Mr. Gioe and Mr. Gioe continues to

threaten and intimidate CBSG's customers.

316.    On February 19, 2018, plaintiffs Radiant Images, Inc. and Gianna Wolfe filed their

complaint in the RICO action captioned *Radiant Images, Inc. v. Complete Business Solutions

Group, Inc.*, No. 18-cv-01492 in the United States District Court for the Southern District of New

York (the "**Radiant Complaint**"). A copy of the Radiant Complaint is attached as **Exhibit MM**.

317.    In the Radiant Complaint, the plaintiffs allege facts strikingly similar to the

collection activities of Mr. Gioe and Mr. McElhone at Source Beauty on January 5, 2017. The

Radiant Complaint plaintiffs allege that on February 15, 2018, a date squarely between the dates

of the Rule 26(a) Disclosures and the Discovery Responses, Mr. Gioe entered their place of

business in Los Angeles, California uninvited and threatened them and certain of their employees when they became unable to make payments to CBSG and Fast Advance. The Radiant Complaint plaintiffs allege that Mr. Gioe then placed a speakerphone call to Mr. McElhone during which Mr. McElhone also threatened them. *See* Radiant Complaint, ¶¶ 1-17, 62-71.

**P.    Source of Funds Debited by Fast Advance and CBSG**

318.    Although the Agreements limited the debits that Fast Advance and CBSG could make from Network Salon's accounts to the "Receipts" and the "electronic check transactions" that would otherwise be due to Network Salon, Fast Advance and CBSG did not observe these contractual limitations.

319.    Fast Advance and CBSG regularly debited funds other than "Receipts" or electronic check settlements.

320.    Ms. Hill transferred funds from various accounts held by Network Salon to the Operating Account and to the CBSG Account to allow Fast Advance and CBSG to make their daily debits due under the Agreements. Frequently, the source of those funds was a Network Salon MCA from another MCA Provider.

321.    Network Salon also paid Fast Advance and CBSG using funds advanced by Fast Advance and/or CBSG, merely handing back the funds recently received.

322.    CBSG has expressly denied that it was entitled to debit MCA Proceeds from Network Salon. *See* Discovery Responses, Request to Admit No. 11.

**Q.    The Fast Advance Transactions and CBSG Transactions are Criminally Usurious**

323.    In the Commonwealth of Pennsylvania, whose laws govern the Agreements (Agreements, § 4.5), a person is guilty of criminal usury, defined in the Article VIII of the Pennsylvania Penal Code of 1939, 18 P.S. 4806.1 *et seq.*, as:

charging, taking or receiving any money, things in action or other property as interest on the loan or forbearance of any money, things in action or other property, at a rate exceeding thirty-six per cent per annum or the equivalent rate for a longer or shorter period, when not otherwise authorized by law.

18 P.S. 4806.1(h).

324.    If treated as loans payable in three months, the interest rate under the Fast Advance Agreements was 160% annually. (Rate=Principal/(Interest x Time)).

325.    If treated as loans payable in 3-4 four months, the interest rates the CBSG Agreements ranged between 109% and 160% annually. (Rate=Principal/(Interest x Time)).

326.    The Fast Advance Transactions and the CBSG Transactions are criminally usurious under Pennsylvania law.

## COUNT I
### Civil Contempt
### 11 U.S.C. § 105(a)
### CBSG, Joseph McElhone, Gino Gioe

327.    The Trustee repeats and realleges the allegations of paragraphs 1 through 326 as though fully set forth herein.

328.    The post-petition actions taken by CBSG, Mr. McElhone, and Mr. Gioe constitute willful violations of the automatic stay imposed by 11 U.S.C. § 362(a).

329.    The automatic stay is a statutory injunction against efforts outside of bankruptcy to collect debts from a debtor who is under the protection of the bankruptcy court.

330.    Pursuant to 11 U.S.C. § 105(a), this court:

may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

331.    By their post-petition actions, CBSG, Mr. McElhone, and Mr. Gioe knowingly violated the automatic stay. CBSG was served with Notices of the Bankruptcy Cases on May 26, 2016. *See* Ex. EE, Notices.

332.    By their post-petition actions, CBSG, Mr. McElhone, and Mr. Gioe willfully violated the automatic stay, a provision of title 11 of the United States Code and a court order, and abused the bankruptcy process by their aggressive collection efforts, including threats of violence against Ms. Hill and her family if Ms. Hill did not pay Network Salon's pre-petition debts.

333.    CBSG, Mr. McElhone, and Gino Gioe should be held in civil contempt.

WHEREFORE, Frances Gecker, not individually but solely in her capacity as Chapter 7 trustee of the bankruptcy estates of Anthia R. Hill and Network Salon Services, LLC, requests that the Court enter judgment in the Trustee's favor and against Complete Business Solutions Group, Inc., Joseph McElhone, and Gino Gioe pursuant to 11 U.S.C. § 105(a) as follows:

A.    Holding Complete Business Solutions Group, Inc., Joseph McElhone, and Gino Gioe in civil contempt for their improper conduct and abuse of the bankruptcy process;

B.    Awarding the Trustee attorney's fees and costs incurred in prosecuting the matter as sanctions for CBSG's conduct;

C.    Holding CBSG, Mr. McElhone, and Mr. Gioe jointly and severally liable to the Trustee for her fees and costs incurred in prosecuting the matter; and

D.    Granting such other and further relief as this Court deems just and proper.

## COUNT II
### Preferential Transfer 11 U.S.C. § 547(b)
### CBSG

334.    The Trustee repeats and realleges the allegations of paragraphs 1 through 333 as though fully set forth herein.

335.    Within ninety days prior to the Petition Date (the "**Preference Period**"), Network Salon transferred property in which it had an interest to or for the benefit of CBSG in the amount of at least $307,622.94 (the "**90-Day Transfers**"). A chart of the 90-Day Transfers made by Network Salon to CBSG is attached as **Exhibit NN**.

336.    The 90-Day Transfers were made from and through the CBSG Account as payments on account of certain of the CBSG Agreements.

337.    At the time the 90-Day Transfers were made, CBSG was Network Salon's creditor under the CBSG Agreements.

338.    The 90-Day Transfers were made to or for the benefit of a creditor of Network Salon and were made on account of an antecedent debt owed by Network Salon to CBSG.

339.    The 90-Day Transfers were made while Network Salon was insolvent as Network Salon's liabilities exceeded its assets at all times during the ninety-day period preceding the Petition Date. In addition, 11 U.S.C. § 547(f) mandates a presumption of Network Salon's insolvency during the Preference Period.

340.    Based on the Trustee's investigation of Network Salon's affairs, unsecured creditors will not receive a 100% distribution on their claims. Therefore, Network Salon's payment of the 90-Day Transfers enabled CBSG to receive more than it would have received under chapter 7 of the Bankruptcy Code if Network Salon had not made the 90-Day Transfers, and CBSG received payment of its debt to the extent provided by the provisions of the Bankruptcy Code.

341.    The 90-Day Transfers are preferential transfers under 11 U.S.C. § 547(b).

342.    CBSG may have received additional preferential transfers that may be uncovered later.

343.    The Trustee may avoid the 90-Day Transfers under 11 U.S.C. § 547(b).

344.    The Trustee may recover the 90-Day Transfers from CBSG under 11 U.S.C. § 550(a)(1).

WHEREFORE, Frances Gecker, not individually but solely in her capacity as chapter 7 trustee of the bankruptcy estates of Network Salon Services, LLC and Anthia R. Hill, requests that the Court enter judgment in the Trustee's favor and against CBSG, pursuant to 11 U.S.C. §§ 547(b) and 550, as follows:

A. Avoiding and directing the return of the 90-Day Transfers from CBSG to the Trustee in an amount not less than $307,622.94, plus prejudgment interest and costs; and

B. Granting such other and further relief as this Court deems just and proper.

### COUNT III
### Actual Fraudulent Transfers, 11 U.S.C. § 548(a)(1)(A)
### CBSG

345.    The Trustee repeats and realleges the allegations of paragraphs 1 through 344 as though fully set forth herein.

346.    Beginning on September 22, 2015, the very date of the First LQD Loan Agreement, through the execution of the Seventh through Fifteenth CBSG Agreements, Network Salon incurred obligations within two years of the Petition Date (the "**Fraudulent Transfer Period**").

347.    In the Seventh CBSG Agreement, dated September 22, 2015, Network Salon incurred the obligation to pay CBSG $284,000 in 132 days in exchange for a $200,000 MCA.

348.    In the Eighth CBSG Agreement, dated October 21, 2015, Network Salon incurred the obligation to pay CBSG $483,361.69 in 136 days in exchange for a $345,272.64 MCA (of which $245,272.64 was earmarked to pay off prior debt to CBSG).

349.    In the Ninth CBSG Agreement, dated November 19, 2015, Network Salon incurred the obligation to pay CBSG $236,040 in 100 days in exchange for a $168,600 MCA (of which $68,600 was earmarked to pay off prior debt to CBSG).

350.    In the Tenth CBSG Agreement, dated December 18, 2015, Network Salon incurred the obligation to pay $370,711.04 in 118 days in exchange for $264,793.60 MCA (of which $189,763.60 was earmarked to pay off prior debt to CBSG).

351.    In the Eleventh CBSG Agreement, dated January 26, 2016, Network Salon incurred the obligation to pay $498,945.80 in 125 days in exchange for $366,838.57 (of which $266,838.67 was earmarked to pay off prior debt to CBSG).

352.    In the Twelfth CBSG Agreement, dated February 5, 2016, Network Salon incurred the obligation to pay CBSG $175,000 in 100 days in exchange for a $125,000 MCA.

353.    In the Thirteenth CBSG Agreement, dated February 18, 2016, Network Salon incurred the obligation to pay CBSG $491,228.44 in 123 days in exchange for a $350,877.46 MCA (of which $250,877.46 was earmarked to pay off prior debt to CBSG).

354.    In the Fourteenth CBSG Agreement, dated February 25, 2016, Network Salon incurred the obligation to pay CBSG $632,773.60 in 140 days in exchange for a $490,522.17 MCA (of which $419,522 was earmarked to pay off prior debt to CBSG).

355.    In the Fifteenth CBSG Agreement, dated March 21, 2016, Network Salon incurred the obligation to pay CBSG $704,712.93 in 128 days in exchange for a $503,366.38 MCA (of which $403,366.38 was earmarked to pay off prior debt to CBSG).

356.    During the Fraudulent Transfer Period, in the Seventh through Fifteenth CBSG Agreements, Network Salon incurred the obligation to pay CBSG a total of $3,876,773.50 (the "**Obligation**").

357.    Knowing that the First LQD Agreement prohibited Network Salon from entering into any further MCA agreements, CBSG induced Network Salon to enter into the Seventh through Fifteenth CBSG Agreements with actual intent to hinder, delay, and defraud LQD, as well as Network Salon's other MCA Providers, by concealing the transactions in the CBSG Account, opened at CBSG's direction and held at BMO rather than at 5/3.

358.    The Trustee may avoid the Obligation under section 548(a)(1)(A) of the Bankruptcy Code.

359.    From September 22, 2015 through the Petition Date, CBSG received $1,238,846.65 from Network Salon (the "**Actual Fraudulent Transfers**"). CBSG debited a total of $896,944.97 from the CBSG Account and received an additional $341,901.68 from LQD. A chart of the Actual Fraudulent Transfers is attached as **Exhibit OO**.

360.    The Actual Fraudulent Transfers were transfers of an interest of Network Salon in property.

361.    The Actual Fraudulent Transfers were made within two years of the Petition Date.

362.    Knowing that the First LQD Agreement prohibited Network Salon from entering into any further MCA agreements, CBSG induced Network Salon to make the Actual Fraudulent Transfers from the CBSG Account, held at BMO rather than at 5/3, with the actual intent to hinder, delay, and defraud LQD, as well as Network Salon's other MCA Providers, by concealing the Actual Fraudulent Transfers in the CBSG Account, opened at CBSG's direction and held at BMO rather at 5/3.

363.   Pursuant to section 548(a)(1)(A) of the Bankruptcy Code, the Actual Fraudulent Transfers are avoidable. 11 U.S.C. § 548(a)(1)(A). The Actual Fraudulent Transfers are recoverable pursuant to section 550(a) of the Bankruptcy Code. 11 U.S.C. § 550(a).

364.   CBSG may have received additional transfers from Network Salon that may later be discovered, avoided under section 548(a)(1)(A) of the Bankruptcy Code and recovered under section 550(a) of the Bankruptcy Code.

WHEREFORE, Frances Gecker, not individually, but solely in her capacity as chapter 7 trustee of the bankruptcy estates of Network Salon and Anthia R. Hill, requests that the Court enter judgment in the Trustee's favor and against CBSG, pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550(a), as follows:

    A.   Avoiding the Obligation;

    B.   Avoiding and directing the return of the Actual Fraudulent Transfers to the Trustee in an amount not less than $1,238,846.65, plus prejudgment interest and costs;

    C.   Granting such other and further relief as this Court deems just and proper.

### COUNT IV
**Constructively Fraudulent Transfers, 11 U.S.C. § 548(a)(1)(B)**
**CBSG**

365.   The Trustee repeats and realleges the allegations of paragraphs 1 through 364 as though fully set forth herein.

366.   In the First CBSG Agreement, dated March 26, 2015, Network Salon incurred the obligation to pay CBSG $76,187.76 in exchange for CBSG's payments to World Global and New Era in the total amount of $53,653. Network Salon did not receive any cash under the First CBSG Agreement.

367.    On information and belief, the First CBSG Agreement allowed CBSG to make daily debits of $865.76 from the Operating Account[18].

368.    From March 27, 2015 through April 22, 2015, CBSG took a total of $77,918 from Network Salon under the First CBSG Agreement. CBSG took nineteen daily cash payments from Network Salon, totaling $16,448.44, and then paid itself $61,470 when it entered into its next MCA agreement with Network Salon.

369.    In the Second CBSG Agreement, dated April 22, 2015, Network Salon incurred the obligation to pay CBSG $186,687.40 in exchange for the $61,470 payoff and $70,000 in cash. The Second CBSG Agreement allowed CBSG to make 120 daily debits of $1,553.73 from the Operating Account.

370.    On April 22, 2015, CBSG deposited only $69,401 to the Operating Account.

371.    From April 23, 2015 through July 3, 2015, CBSG took a total of $185,821.23 from Network Salon under the Second CBSG Agreement. CBSG took 51 daily cash payments from Network Salon, totaling $79,342.23, and then paid itself $106,479 when it entered into the Fifth CBSG Agreement on July 3, 2015.

372.    In the Third CBSG Agreement, dated May 26, 2015, Network Salon incurred the obligation to pay CBSG $84,000 in exchange for $60,000 in cash. The Third CBSG Agreement allowed CBSG to make 100 daily debits of $840 from the Operating Account.

373.    On May 27, 2018, CBSG deposited only $58,732 into the Operating Account.

374.    From May 29, 2015 through June 15, 2015, CBSG took a total of $84,915 from Network Salon under the Third CBSG Agreement. CBSG took ten daily cash payments from

---

[18] The document produced by CBSG is illegible.

Network Salon, totaling $10,080 and one cash payment of $915, and then paid itself $73,920 when it entered into the Fourth CBSG Agreement.

375.    In the Fourth CBSG Agreement, dated June 15, 2015, Network Salon incurred the obligation to pay CBSG $187,488 in exchange for the $73,920 payoff of the Third CBSG Agreement and $60,000 in cash. The Fourth CBSG Agreement allowed CBSG to make daily debits of $1,874.88 for 100 days.

376.    On June 15, 2015, CBSG made two deposits to the Operating Account, totaling only $58,732.

377.    On information and belief, from June 16, 2015 through September 22, 2015, CBSG took a total of $221,360.94 from Network Salon under the Fourth CBSG Agreement. CBSG took 72 cash payments totaling 92,945.08[19] from the Operating Account under the Fourth CBSG Agreement. On September 22, 2015, LQD paid CBSG $128,415.86 to pay off the Fourth CBSG Agreement.

378.    In the Fifth CBSG Agreement, dated July 3, 2015, Network Salon incurred the obligation to pay CBSG $261,070 in exchange for the $106,479 payoff of the Second CBSG Agreement and $80,000 in cash. The Fifth CBSG Agreement allowed CBSG to make 110 daily debits of $2,373.37.

379.    On July 3, 2015 CBSG deposited only $78,732 into the Operating Account.

380.    On information and belief, from July 6, 2015 through September 22, 2015, CBSG took a total of $299,828.55 from Network Salon under the Fifth CBSG Agreement. CBSG took 57 cash payments, totaling $86,342.76 from the Operating Account under the Fifth CBSG

---

[19] CBSG appears to have temporarily adjusted the daily debit for the Fourth CBSG Agreement to $1,000 from July 14, 2015 through August 3, 2015 and to $937.44 from August 5, 2015 through September 4, 2015 and again from September 14-22, 2015. However, CBSG did not produce any ledger sheets or correspondence to explain the change, even though such documents and information would have been responsive to the Trustee's Discovery Requests.

Agreement. [20] On September 22, 2015, LQD paid CBSG $213,845.82 to pay off the Fifth CBSG

Agreement.

381.    In the Sixth CBSG Agreement, dated September 3, 2015, Network Salon incurred

the obligation to pay CBSG $140,000 in exchange for $100,000 in cash. The Sixth CBSG

Agreement allowed CBSG to make 100 daily debits of $1,400 from the Operating Account. Ms.

Hill also allowed CBSG to make debits from her Personal Account under the Sixth CBSG

Agreement.

382.    On September 3, 2015, CBSG deposited only $98,432 into the Operating Account.

383.    On information and belief, from September 8, 2018 through October 20, 2015,

CBSG took a total of $142,875 from Network Salon under the Sixth Agreement. CSBG took 11

cash payments, totaling $15,400, from the Operating Account from September 8, 2015 through

September 22, 2015 under the Sixth CBSG Agreement. After September 22, 2015, the date of the

LQD Agreement, CBSG began making daily $1,400 debits from the CBSG Account. CBSG took

41 cash payments, totaling $58,875, from the CBSG Account under the Sixth CBSG Agreement

and then paid itself $68,600 when it entered into the Ninth CBSG Agreement.

384.    In the Seventh CBSG Agreement, dated September 22, 2015, the date of the LQD

Agreement, Network Salon incurred the obligation to pay CBSG $284,000 in exchange for

$200,000 in cash. The Seventh CBSG Agreement allowed CBSG to make 132 daily debits of

$2,251.52 from the CBSG Account.

385.    On September 23, 2015, CBSG deposited only $198,432 to the CBSG Account.

---

[20] CBSG appears periodically to have adjusted the debit amounts during the life of the Fifth CBSG Agreement. However, CBSG did not produce any ledger sheets or correspondence to explain the change, even though such documents and information would have been responsive to the Trustee's Discovery Requests.

386.    From September 23, 2015 through October 21, 2015, CBSG took a total of $284,000 from Network Salon under the Seventh CBSG Agreement. CBSG took 18 cash payments totaling $38,727.36 from the CBSG Account under the Seventh Agreement, and then paid itself $245,272.64 when it entered into the Eighth CBSG Agreement.

387.    In the Eighth CBSG Agreement, dated October 21, 2015, Network Salon incurred the obligation to pay CBSG $483,381.69 in exchange for the $245,272.64 payoff of the Seventh CBSG Agreement and $100,000 in cash. The Eighth CBSG Agreement allowed CBSG to make 136 daily debits of $3,554.28 from the CBSG Account.

388.    On October 21, 2015, CBSG deposited only $98,432 to the CBSG Account.

389.    From October 22, 2015 through January 27, 2016, CBSG took a total of $501,646.05 from Network Salon under the Eighth CBSG Agreement. CBSG took 63 cash payments totaling $234,807.48 from the CBSG Account under the Eighth CBSG Agreement and then paid itself $266,838.57 when it entered into the Eleventh CBSG Agreement.

390.    In the Ninth CBSG Agreement, dated November 19, 2015, Network Salon incurred the obligation to pay CBSG $236,040 in exchange for the $68,600 payoff of the Sixth CBSG Agreement and $100,000 in cash. The Ninth CBSG Agreement allowed CBSG to make 100 debits of $2,360.40 from the CBSG Account.

391.    On November 20, 2015 CBSG deposited only $98,432 into the CBSG Account.

392.    From November 23, 2015 through December 21, 2015, CBSG took a total of $237,000.40 from Network Salon under the Ninth CBSG Agreement. CBSG took 20 cash payments totaling $47,206.80 from the CBSG Account under the Ninth CBSG Agreement and then paid itself $189,793.60 when it entered into the Tenth CBSG Agreement.

393.    In the Tenth CBSG Agreement, dated December 18, 2015, Network Salon incurred the obligation to pay CBSG $370,711.04 in exchange for the $189,793.60 payoff of the Ninth

CBSG Agreement and $75,000 in cash. The Tenth CBSG Agreement allowed CBSG to make 118 daily debits of $3,141.62 from the CBSG Account.

394.    On December 21, 2015, CBSG deposited only $73,432 into the CBSG Account.

395.    From December 22, 2015 through February 18, 2016, CBSG took a total of $373,550.64 from Network Salon under the Tenth CBSG Agreement. CBSG took 39 cash payments totaling $122,673.18 from the CBSG Account under the Tenth CBSG Agreement and then paid itself $250,877.46 when it entered into the Thirteenth CBSG Agreement.

396.    In the Eleventh CBSG Agreement, dated January 26, 2016, Network Salon incurred the obligation to pay CBSG $498,900.45 in exchange for the $266,838.57 payoff of the Eighth CBSG Agreement and $100,000 in cash. The Eleventh CBSG Agreement allowed CBSG to make 125 daily debits of $3,991.20 from the CBSG Account.

397.    On January 27, 2016, CBSG deposited only $98,432 into the CBSG Account.

398.    From January 28, 2016 through February 25, 2016, CBSG took a total of $495,346 from Network Salon under the Eleventh CBSG Agreement. CBSG took 20 cash payments totaling $79,824 from the CBSG Account under the Eleventh CBSG Agreement and then paid itself $415,522 when it entered into the Fourteenth CBSG Agreement.

399.    In the Twelfth CBSG Agreement, dated February 5, 2016, Network Salon incurred the obligation to pay CBSG $175,000 in exchange for $125,000 in cash. The Twelfth CBSG Agreement allowed CBSG to make 100 daily debits of $1,750 from the CBSG Account.

400.    On February 5, 2016, CBSG deposited only $123,432.00 into the CBSG Account.

401.    From February 9, 2016 through the Petition Date, CBSG took at least $64,750 from Network Salon under the Twelfth CBSG Agreement. CBSG took at least 37 cash payments totaling at least $64,750 from the CBSG Account.

402.    In the Thirteenth CBSG Agreement, dated February 18, 2016, Network Salon incurred the obligation to pay CBSG $491,228.44 in exchange for the $250,877.46 payoff of the Tenth CBSG Agreement and $100,000 in cash. The Twelfth CBSG Agreement allowed CBSG to make 123 daily debits of $3,993.73 from the CBSG Account.

403.    On February 18, 2016, CBSG deposited only $98,432 into the CBSG Account.

404.    From February 19, 2016 through March 21, 2016, CBSG took a total of $491,514.44 from Network Salon under the Thirteenth CBSG Agreement. CBSG took 44 cash payments totaling $88,148.06 from the CBSG Account and then paid itself $403,366.38 when it entered into the Fifteenth CBSG Agreement.

405.    In the Fourteenth CBSG Agreement, dated February 25, 2016, Network Salon incurred the obligation to pay CBSG $632,773.60 in exchange for the $415,522 payoff of the Eleventh CBSG Agreement and $75,000 in cash. The Fourteenth CBSG Agreement allowed CBSG to make 140 daily debits of $4,519.81 from the CBSG Account.

406.    On February 25, 2016, CBSG deposited only $73,432 into the CBSG Account.

407.    From February 26, 2016 through the Petition Date, CBSG took at least 25 cash payments totaling at least $112,995.25 from the CBSG Account under the Fourteenth CBSG Agreement.

408.    In the Fifteenth CBSG Agreement, dated March 21, 2016, Network Salon incurred the obligation to pay CBSG $704,712.93 in exchange for the $403,366.38 payoff of the Thirteenth CBSG Agreement and $100,000 in cash. The Fifteenth CBSG Agreement allowed CBSG to make 128 daily debits of $5,505.57 from the CBSG Account.

409.    On March 21, 2016, CBSG deposited only $98,432 into the CBSG Account.

410.    From March 22, 2016 through the Petition Date, CBSG took at least at least 8 cash payments totaling at least $44,044.56 from the CBSG Account under the Fifteenth CBSG Agreement.

411.    From March 27, 2015 through the Petition Date, CBSG took at least $3,617,566.06 in cash and rollover debt from Network Salon.

412.    From March 27, 2015 through the Petition Date, CBSG took at least $1,540,320.13 in cash from Network Salon (the "**CBSG Constructively Fraudulent Transfers**"). From March 27, 2015 through the Petition Date, CBSG debited at least $301,473.48 from the Operating Account. On September 22, 2015, CBSG received $341,901.68 from LQD. From September 23, 2015 through the Petition Date, CBSG debited at least $896,944.97 from the CBSG Account. A chart of the CBSG Constructively Fraudulent Transfers is attached as **Exhibit PP**.

413.    From March 27, 2015 through the Petition Date, Network Salon received only $1,299,917 in cash from CBSG.

414.    From March 27, 2015 through the Petition Date, Network Salon paid CBSG at least $240,403.13 more in cash than it received in cash.

415.    Under the First through Fifteenth CBSG Agreements, Network Salon incurred obligations and transferred interests in its property to CBSG within two years of the Petition Date for which it received less than reasonably equivalent.

416.    Network Salon was insolvent on the dates it incurred the obligations and made the CBSG Constructively Fraudulent Transfers.

417.    Network Salon was engaged in business and transactions for which its remaining property was unreasonably small capital.

418.    Network Salon believed that it would incur debts beyond its ability to pay as they matured.

419.    Pursuant to 11 U.S.C. § 548(a)(1)(B), the CBSG Constructively Fraudulent Transfers are avoidable as fraudulent transfers.

420.    CBSG may have received additional constructively fraudulent transfers from Network Salon that may be uncovered later.

421.    Pursuant to 11 U.S.C §550(a), the Trustee may recover any avoided CBSG Constructively Fraudulent Transfers from CBSG.

WHEREFORE, Frances Gecker, not individually, but solely in her capacity as chapter 7 trustee of the bankruptcy estates of Network Salon and Anthia R. Hill, requests that the Court enter judgment in the Trustee's favor and against Complete Business Solutions Group, Inc. under 11 U.S.C. §§ 548(a)(1)(B) and 550, as follows:

A.  Avoiding and directing the return of the CBSG Constructively Fraudulent Transfers to the Trustee in an amount to be determined at trial, but not less than $240,403.13, plus prejudgment interest and costs; and

B.  Granting such other and further relief as this Court deems just and proper.

### COUNT V
### Constructively Fraudulent Transfers, 11 U.S.C. § 548(a)(1)(B)
### Fast Advance

422.    The Trustee repeats and realleges the allegations of paragraphs 1 through 421 as though fully set forth herein.

423.    In the First Fast Advance Agreement, dated March 5, 2015, Network Salon incurred the obligation to pay Fast Advance $140,000 in exchange for Fast Advance's payoff of Network Salon's MCA debt to Knight, Capital Stack, and Yellowstone[21] and an unspecified sum

---

[21] Although records of amounts Fast Advance paid to Knight, Capital Stack, and Yellowstone would have been responsive to the Discovery Requests, CBSG did not produce any. Nor did CBSG produce any records of communications with Ms. Hill regarding the payoffs.

in cash. The First Fast Advance Agreement allowed Fast Advance to make 88 daily debits of $1,590 from the Operating Account.

424.    On March 6, 2015, Fast Advance deposited $25,854.82 into the Operating Account.

425.    From March 10, 2015 through May 4, 2015, Fast Advance took a total of $141,665 from Network Salon under the First Fast Advance Agreement. Fast Advance took 41 daily cash payments totaling $65,190 from the Operating Account and paid itself $76,475when it entered into the Second Fast Advance Agreement.

426.    Fast Advance took $1,665 more from Network Salon than it bargained for in the First Fast Advance Agreement.

427.    In the Second Fast Advance Agreement, dated May 4, 2015, Network Salon incurred the obligation to pay Fast Advance $177,039 in exchange for the $76,475 payoff of the First Fast Advance Agreement and $50,000 in cash. The Second Fast Advance Agreement allowed Fast Advance to make 80 daily debits of $2,212.98 from the Operating Account.

428.    On May 4, 2015, Fast Advance deposited $48,832 into the Operating Account.

429.    From May 5, 2015 through August 14, 2015, Fast Advance took a total of $202,991.01 from Network Salon under the Second Fast Advance Agreement. Fast Advance took 126 cash payments totaling $139,417.74 from the Operating Account and then paid itself $63,573.27 when it entered into the Third Fast Advance Agreement.

430.    Fast Advance took $25,952.01 more from Network Salon than it bargained for in the Second Fast Advance Agreement.

431.    In the Third Fast Advance Agreement, dated August 14, 2015, Network Salon incurred the obligation to pay Fast Advance $131,002.58 in exchange for the $63,573.27 payoff of the Second Fast Advance Agreement and $30,000 in cash. The Third Fast Advance Agreement allowed Fast Advance to make 88 daily debits of $1,488.67 from the Operating Account.

432.    On August 14, 2015, Fast Advance deposited only $27,550.51 into the Operating Account.

433.    From August 17, 2015 through September 22, 2015, Fast Advance took a total of $145,889.28 in cash from Network Salon under the Third Fast Advance Agreement. Fast Advance took 26 cash payments totaling $38,705.42 from the Operating Account and then received $107,183.86 from LQD on September 22, 2015.

434.    Fast Advance took $14,886.70 more from Network Salon than it bargained for in the Third Fast Advance Agreement.

435.    From March 5, 2015 through the Petition Date, Fast Advance took at least $42,503.71 more from Network Salon than it had bargained for in the Fast Advance Agreements (the "**Overpayments**").

436.    From March 5, 2015 through the Petition Date, Fast Advance took at least $490,545.29 in cash and rollover debt from Network Salon.

437.    From March 5, 2015 through the Petition Date, Fast Advance took at least $350,497.02 in cash from Network Salon. From March 10, 2015 through September 22, 2015, Fast Advance debited at least $243,313.16 from the Operating Account. A chart of the debits made by Fast Advance is attached as **Exhibit QQ**. On September 22, 2015, Fast Advance received $107,183.86 from LQD.

438.    From March 5, 2015 through the Petition Date, Network Salon received only $102,237.33 in cash from Fast Advance.

439.    From March 5, 2015 through the Petition Date, Network Salon paid Fast Advance at least $248,259.69 in cash than it received in cash (the "**Fast Advance Constructively Fraudulent Transfers**").

440.   Under the Fast Advance Agreements, Network Salon incurred obligations and transferred interests in its property to Fast Advance within two years of the Petition Date for which it received less than reasonably equivalent value.

441.   Through the Overpayments, Network Salon transferred interests in its property to Fast Advance within two years of the Petition Date for which it received less than reasonably equivalent value.

442.   Network Salon was insolvent on the dates it incurred the obligations and made the Fast Advance Constructively Fraudulent Transfers, including the Overpayments.

443.   Network Salon was engaged in business and transactions for which its remaining property was unreasonably small capital.

444.   Network Salon believed that it would incur debts beyond its ability to pay as they matured.

445.   Pursuant to 11 U.S.C. § 548(a)(1)(B), the Fast Advance Constructively Fraudulent Transfers, including the Overpayments, are avoidable as fraudulent transfers.

446.   Fast Advance may have received additional constructively fraudulent transfers from Network Salon that may be uncovered later.

447.   Pursuant to 11 U.S.C §550(a) the Trustee may recover any avoided Fast Advance Constructively Fraudulent Transfers from Fast Advance.

WHEREFORE, Frances Gecker, not individually, but solely in her capacity as chapter 7 trustee of the bankruptcy estates of Network Salon and Anthia R. Hill, requests that the Court enter judgment in the Trustee's favor and against Fast Advance Funding, LLC under 11 U.S.C. §§ 548(a)(1)(B) and 550, as follows:

     A.   Avoiding and directing the return of the Overpayments in an amount not less than

          $42,503.71, plus prejudgment interest and costs;

B. Avoiding and directing the return of the Fast Advance Constructively Fraudulent Transfers, including the Overpayments, to the Trustee in an amount to be determined at trial, but not less than $248,259.69, plus prejudgment interest and costs; and

C. Granting such other and further relief as this Court deems just and proper.

## COUNT VI
### Restitution of Overpayments
### Fast Advance

448.    The Trustee repeats and realleges the allegations of paragraphs 1 through 447 as though fully set forth herein.

449.    The Fast Advance Agreements limited the amounts that Fast Advance could take from Network Salon to the "Receipts Purchased Amount" set forth in each Fast Advance Agreement.

450.    Fast Advance was not contractually entitled to take the Overpayments.

WHEREFORE, Frances Gecker, not individually, but solely in her capacity as chapter 7 trustee of the bankruptcy estates of Network Salon and Anthia R. Hill, requests that the Court enter judgment in the Trustee's favor and against Fast Advance Funding, LLC as follows:

A. Directing the return of the Overpayments in an amount not less than $42,503.71, plus prejudgment interest and costs; and

B. Granting such other and further relief as this Court deems just and proper.

## COUNT VII
### Failure of Condition Precedent
### CBSG

451.    The Trustee repeats and realleges the allegations of paragraphs 1through 450 as though fully set forth herein.

452.    Each CBSG Agreement requires that: (i) Network Salon sell products and services
(ii) Network Salon receive payment for those goods and services from its customers; (iii) that the
customers pay in the "manner provided in Section 1.1" of each Agreement." (CBSG Agreements,
§ 1.10). The CBSG Agreements expressly condition CBSG's right to payment on those three
things and limit the source of payments to CBSG to "settlement amounts which would otherwise
be due to Merchant from electronic check transactions." (CBSG Agreements, § 1.1) (the
"**Limitation**").

453.    The Limitation is a condition precedent to CBSG's right to make debits to any
Network Salon account (the "**Condition Precedent**").

454.    The CBSG Agreements do not permit CBSG to take MCA Proceeds from Network
Salon. CBSG has judicially admitted that the CBSG Agreements do not permit CBSG to take
MCA Proceeds from Network Salon. *See* Ex. I, Responses, Request to Admit No. 11.

455.    The Limitation prevents CBSG from debiting funds deposited in Network Salon's
Accounts by, among other things, intra- or inter-bank transfers, wire transfers, paper checks, or
cash.

456.    At all times relevant, through its online access, CBSG knew that it was debiting
funds deposited in Network Salon's accounts by means other than electronic check paid by
Network Salon's customers for the sale of goods and services. CBSG was fully aware that it daily
debited funds from, among other things, intra-bank and inter-bank transfers from other Network
Salon accounts or the Personal Account, paper checks, ATM deposits, and cash.

457.    At all times relevant, through both its online access and its relationship to Fast
Advance, CBSG knew that it was debiting funds deposited in Network Salon's accounts by MCA
Providers, including, but not limited to, itself and Fast Advance.

458.    The Condition Precedent to CBSG's right to debit the Operating Account fails in an amount to be determined at trial.

459.    From September 17, 2015 through March 31, 2015 there were only eleven electronic check settlements in the CBSG Account. The electronic check deposits totaled only $16,490.87.

460.    From September 23, 2015 through March 31, 2015 CBSG debited $896,944.97 from the CBSG Account, even though it knew or should have known that there were only $16,490.87 in electronic check deposits.

461.    The Condition Precedent to CBSG's right to debit the CBSG Account fails in the amount of $880,454.10.

462.    At all times relevant, CBSG knew that the Condition Precedent had failed.

463.    Due to the failure of the Condition Precedent and its knowledge thereof, CBSG knowingly and tortiously initiated debits from the Operating Account and the CBSG Account.

464.    Due to the failure of the Condition Precedent and its knowledge thereof, CBSG knowingly and tortiously took funds from the Operating Account in an amount to be determined at trial.

465.    Due to the failure of the Condition Precedent and its knowledge thereof, CBSG knowingly and tortiously took funds from the CBSG Account in the amount of $880,454.10.

466.    CBSG induced Network Salon to enter into the Seventh through Fifteenth CBSG Agreements to conceal them from Network Salon's creditors and, thus, to commit fraud upon those creditors by siphoning funds from Network Salon through the CBSG Account.

467.    Ms. Hill and Network Salon were damaged by CBSG's knowing and tortious conduct and that damage contributed substantially to Network Salon's failure.

468.    CBSG may have knowingly and tortiously taken additional funds from Network Salon that may be discovered later.

WHEREFORE, the Trustee requests that the Court enter judgment in the Trustee's favor and against CBSG as follows:

A.   Directing the return of all debits CBSG made from the Operating Account despite the failure of the Condition Precedent in an amount to be determined at trial;

B.   Directing the return of at least $880,454.10 debited by CBSG from the CBSG Account despite the failure of the Condition Precedent, plus prejudgment interest and costs;

C.   Assessing punitive damages against CBSG for its knowing and tortious conduct in the amount of at least $2,641,362.30 million; and

D.   Granting such other and further relief as this Court deems just and proper.

## COUNT VIII
### Failure of Condition Precedent
### Fast Advance

469.    The Trustee repeats and realleges the allegations of paragraphs 1through 468 as though fully set forth herein.

470.    Each Fast Advance Agreement is subject to the Limitation and the Condition Precedent. (Fast Advance Agreements, §§ 1.1 and 1.10).

471.    The Fast Advance Agreements do not permit Fast Advance to take MCA Proceeds from Network Salon.

472.    The Limitation prevents Fast Advance from debiting funds deposited in Network Salon's Accounts by, among other things, intra- or inter-bank transfers, wire transfers, paper checks, or cash.

473.    At all times relevant, through its online access, Fast Advance knew that it was debiting funds deposited in Network Salon's accounts by means other than electronic check paid by Network Salon's customers for the sale of goods and services. Fast Advance was fully aware that it daily debited funds from, among other things, intra-bank and inter-bank transfers from other Network Salon accounts or the Personal Account, paper checks, ATM deposits, and cash.

474.    At all times relevant, through both its online access and its relationship to CBSG, Fast Advance knew that it was debiting funds deposited in Network Salon's accounts by MCA Providers, including, but not limited to, itself and CBSG.

475.    The Condition Precedent to Fast Advance's right to debit the Operating Account fails in an amount to be determined at trial.

476.    At all times relevant, Fast Advance knew that the Condition Precedent had failed.

477.    Due to the failure of the Condition Precedent and its knowledge thereof, Fast Advance knowingly and tortiously initiated debits from the Operating Account.

478.    Due to the failure of the Condition Precedent and its knowledge thereof, CBSG knowingly and tortiously took funds from the Operating Account in an amount to be determined at trial.

479.    Ms. Hill and Network Salon were damaged by Fast Advance's knowing and tortious conduct and that damage contributed substantially to Network Salon's failure.

480.    Fast Advance may have knowingly and tortiously taken additional funds from Network Salon that may be discovered later.

WHEREFORE, the Trustee requests that the Court enter judgment in the Trustee's favor and against Fast Advance Funding, LLC as follows:

A.  Directing the return of all debits Fast Advance made from the Operating Account despite the failure of the Condition Precedent in an amount to be determined at trial;

B.  Assessing punitive damages against Fast Advance for its knowing and tortious conduct in an amount to be determined at trial; and

C.  Granting such other and further relief as this Court deems just and proper.

## COUNT IX
### Restitution of MCA Proceeds
### CBSG

481.    The Trustee repeats and realleges the allegations of paragraphs 1through 480 as though fully set forth herein.

482.    The CBSG Agreements do not entitle CBSG to Network Salon's MCA Proceeds. The CBSG Agreements purport to give CBSG a claim only to funds subject to the Limitation.

483.    Nevertheless, on account of the CBSG Agreements and on a regular basis, Ms. Hill left funds advanced by CBSG in the Operating Account and the CBSG Account or transferred other MCA Proceeds into the Operating Account or the CBSG Account to cover CBSG's debits.

484.    CBSG had no right to take MCA Proceeds.

485.    CBSG wrongfully took MCA Proceeds from the Operating Account in an amount to be determined at trial.

486.    CBSG took at least $880,454.10 in MCA Proceeds from the CBSG Account.

487.    CBSG may have taken additional MCA Proceeds to be discovered later.

WHEREFORE, Frances Gecker, not individually, but solely in her capacity as chapter 7 trustee of the bankruptcy estates of Network Salon and Anthia R. Hill, requests that the Court enter judgment in the Trustee's favor and against Complete Business Solutions Group, Inc. as follows:

A.  Directing the return of all MCA Proceeds taken by Complete Business Solutions
Group, Inc. from the Operating Account in an amount to be determined at trial;

B.  Directing the return of all MCA Proceeds taken by Complete Business Solutions
Group, Inc. from the CBSG Account in the amount of at least $880,454.10, plus
prejudgment interest and costs and;

C.  Granting such other and further relief as this Court deems just and proper.

## COUNT X
### Restitution of MCA Proceeds
### Fast Advance

488.    The Trustee repeats and realleges the allegations of paragraphs 1 through 487 as
though fully set forth herein.

489.    The Fast Advance Agreements do not entitle Fast Advance to Network Salon's
MCA Proceeds. The Fast Advance Agreements purport to give Fast Advance a claim only to
funds subject to the Limitation.

490.    Nevertheless, on account of the Fast Advance Agreements and on a regular basis,
Ms. Hill left funds advanced by Fast Advance in the Operating Account or transferred other MCA
Proceeds into the Operating Account to cover Fast Advance's debits.

491.    Fast Advance had no right to take MCA Proceeds.

492.    Fast Advance wrongfully took MCA Proceeds from the Operating Account in an
amount to be determined at trial.

493.    Fast Advance may have taken additional MCA Proceeds to be discovered later.

WHEREFORE, Frances Gecker, not individually, but solely in her capacity as chapter 7
trustee of the bankruptcy estates of Network Salon and Anthia R. Hill, requests that the Court
enter judgment in the Trustee's favor and against Fast Advance Funding, LLC. as follows:

A.  Directing the return of all MCA Proceeds taken by Fast Advance Funding, LLC

from the Operating Account in an amount to be determined at trial; and;

B.  Granting such other and further relief as this Court deems just and proper.

**COUNT XI**
**Disallowance of Claims – 11 U.S.C. § 502(d)**
**CBSG and Fast Advance**

494.    The Trustee repeats and realleges the allegations of paragraphs 1 through 493 as

though fully set forth herein.

495.    CBSG and Fast Advance are recipients of preferential and/or fraudulent transfers,

avoidable pursuant to sections 547 and 548 of the Bankruptcy Code and recoverable under section

550 of the Bankruptcy Code.

496.    Neither CBSG nor Fast Advance has paid the amount of the preferential transfers

and/or constructive and actual fraudulent transfers or turned over such property for which they are

liable under section 550 of the Bankruptcy Code.

497.    Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of CBSG

and Fast Advance against Network Salon must be disallowed until such time as they pay the

Trustee the amount equal to the aggregate amount of all of the preferential Transfers and

constructive and actual fraudulent transfers, plus interest thereon and costs.

WHEREFORE, Frances Gecker, not individually, but solely in her capacity as

chapter 7 trustee of the bankruptcy estates of Anthia R. Hill and Network Salon, requests that the

Court enter judgment in the Trustee's favor and against Complete Business Solutions Group, Inc.

and Fast Advance Funding, LLC, pursuant to 11 U.S.C. § 502(d) as follows:

A.    Disallowing any claims that have been or may be filed by Complete

Business Solutions Group, Inc. and/or Fast Advance Funding, LLC against

Network Salon or Ms. Hill, pursuant to 11 U.S.C. § 502(d), until the Trustee has

recovered the preferential transfers and/or fraudulent transfers from Network Salon

to the defendants; and

B.      Granting such other and further relief as this Court deems just and proper.

Dated:    June 27, 2018                      FRANCES GECKER, not individually, but
                                             solely in her capacity as chapter 7 trustee for
                                             the bankruptcy estates of Network Salon
                                             Services, LLC and Anthia R. Hill




                                     By:    _/s/ Karen V. Newbury_____
                                            One of her attorneys

Karen V. Newbury
FRANKGECKER LLP
325 North LaSalle Street
Suite 625
Chicago, Illinois 60654
Telephone:     (312) 276-1400
Facsimile:     (312) 276-0035
knewbury@fgllp.com